LANE (THOMAS v.). See Case No. 13,902.

## Case No. 8,054.

### LANE v. TOWNSEND et al.

[1 Ware (286) 289; [1] 17 Am. Jur. 51.]

District Court, D. Maine. Aug. 17, 1835.

WRITS IN FEDERAL COURTS—ADOPTION OF STATE WRITS—PRACTICE AT LAW — BAIL-BOND IN ADMIRALTY—STIPULATIONS IN PROGRESS OF CAUSE —SURRENDER OF PRINCIPAL.

1. The process act of 1789 [1 Stat. 93] adopted for the courts of the United States, in each state respectively, the forms of writs and other process, and the forms and modes of proceeding in suits at common law, as they existed at that time in the supreme courts of the states; but did not adopt prospectively such alterations as the states might afterwards make.

[Cited in Lewis v. The Orpheus, Case No. 8,330; The Young Mechanic, Id. 18,182.]

2. The taking of a bail-bond for the appearance of a party to answer to a suit, is part of the forms and modes of proceeding in a cause, and the liabilities of the parties to it are to be determined by the rules of practice in the United States courts, and not by those of the state courts.

3. Such an instrument, taken to secure the appearance of a party to answer a libel in the admiralty, is to be considered not as a bail-bond at common law, but as an admiralty stipulation, and construed according to the rules and the practice of courts of admiralty touching such stipulations.

[Cited in Carroll v. The Leathers, Case No. 2,455; The Ann Caroline v. Wells, 2 Wall. (69 U. S.) 548; The Wanata v. Avery, 95 U. S. 605.]

4. Stipulations taken in the progress of a cause, for the purpose of sustaining and rendering effectual the jurisdiction of the court, are to be interpreted as to the extent and limitation of responsibility created by them by the intention of the court which required them, and not by the intention of the parties who are bound by them.

[Cited in The Roslyn, Case No. 12,068.]

5. By a stipulation conditioned for the appearance of a party to answer a libel and await and abide the decision of the court, the fidejussors are not fixed irrevocably by the return of non est inventus on the execution, but they may surrender the principal at any time before a decree against them, on a citation to show cause in the nature of a scire facias at common law.

[Cited in Re Snow, Case No. 13,141; Louisiana Ins. Co. v. Nickerson, Id. 8,539.]

6. Practice of the admiralty in regard to stipulations. Stipulations required by the Roman law, and the manner of commencing a suit.

[Cited in The Infanta, Case No. 7,031.]

This was a scire facias, or a proceeding in the nature of a scire facias, against bail. The plaintiff, Lane, obtained a decree upon a libel on the admiralty side of the court, for $100 damages and costs, against John M. Jordan, on the 27th of June, 1833. On the 12th of December following, he took out execution and delivered it to the deputy marshal, returnable at the next February term of the court. On the return day, the officer

---

[1] [Reported by Hon. Ashur Ware, District Judge.]

made his return on the execution that he had made diligent search for the property of the said Jordan, to satisfy the execution, and could find none, and for the body, and that he was not to be found. The defendants in the action were sureties for his appearance to answer the original libel on which the decree was obtained. The condition of the bond, in substance, is that said Jordan shall appear and answer to the process, and shall abide and perform the judgment of the court, or of any other court before which said process shall in due course of law be finally determined, and shall not depart without license, then the obligation to be void, otherwise to remain in full force. The suit against the bail was commenced the 12th of June, 1834. On the 28th of August following, the defendants committed Jordan to the county jail in Portland, for the purpose of discharging themselves from their liability as bail, and on the same day gave notice of the commitment to the proctor of the libellant. The question whether, on these facts, the defendants were discharged from their liability, was argued.

C. S. Daveis, for plaintiff.
J. L. Megquier, for defendants.

WARE, District Judge. The defendants rely, in the first place, for their defence against this action, on the provisions of the law of Maine of March 19, 1821, c. 67, § 1. This act provides that when any person becomes bail for the appearance of a party in any civil suit, and judgment is recovered against the principal, the bail may take him and commit him to the keeper of the jail in the county where the arrest was made, or in that in which the writ was returnable, and the gaoler is required to receive the party into his custody; and that upon the bail notifying the plaintiff or his attorney, within fifteen days after the commitment, of the time and place when and where the party is committed, provided the commitment is before final judgment on the scire facias, the bail shall be exonerated from their liability on the bond. The commitment was, in this case, after the return of non est inventus on the execution, and after this process was commenced, but before final judgment upon it. It is admitted that the bail have pursued the regular steps required by this act to exonerate them from their liability, and if the liabilities of bail in suits in the courts of the United States are to be determined by the local law of the state, that judgment must be in their favor. It is contended that the local law does apply and constitute the law of the case. The 34th section of the judiciary act of September 24, 1789 [1 Stat. 92], is referred to as furnishing the rule for governing the decision of the court. This provides that the laws of the several states, except where the constitution, treaties, or statutes of the United States otherwise provide, shall be regarded as rules of decision at common law in cases where they apply. The question then is, does the law of the state apply to the case. It has been decided by the supreme court that this section is merely a legislative recognition of a principle of universal jurisprudence as to the operation of the lex loci, that every contract is to be governed by the laws with a view to which it was made; but that it does not affect the modes of proceeding or practice of the courts. Wayman v. Southard, 10 Wheat. [23 U. S.] 1.

That it could not have been the intention of congress, in that section of the act referred to, to regulate the course of judicial proceedings, is clear from the fact that the next act in the statute-book takes up this subject. It is the act to regulate processes in the courts of the United States. This provides that the forms of writs and process in the courts of the United States, except their style, in suits at common law, shall be the same in each state respectively as are now used in the supreme court of the same. 1 Laws U. S. c. 21. This act adopted the state practice as it then existed, but it did not adopt prospectively the changes which might be afterwards made. It continued in force until 1792, when a new act was passed. This provides that the forms of writs, executions, and other process, and the forms and modes of proceedings, in suits at common law, shall be the same as are now used in the courts, subject to such alterations and additions as the courts may in their discretion make, or as the supreme court may by rule prescribe to any circuit or district court. Act May 8, 1792 [1 Stat. 275]. This act regulated the practice of the courts of the United States in this state until the year 1828, when "An act further to regulate processes in the courts of the United States,"—May 19, 1828, c. 68 [4 Stat. 278],—was passed, which provides "that the forms of mesne process, except the style, and the forms and modes of proceeding in suits in the courts of the United States, held in those states admitted into the Union since the 29th of September, 1789— in those of common law, shall be the same in each of the said states respectively, as are now used in the highest court of original jurisdiction of the same,—in proceedings in equity, according to the principles, rules, and usages which belong to courts of equity—and in those of admiralty and maritime jurisprudence, according to the principles, rules, and usages which belong to courts of admiralty, as contradistinguished from courts of common law, except so far as has been otherwise provided for by acts of congress," subject to such alterations as should be made by the courts, or as should be prescribed to them by the supreme court. The third section of the act provides, "that writs of execution and other final process, issued on judgments and decrees rendered in any of the courts of the United States, and the proceedings thereupon, shall be the same, except their style, in

each state respectively, as are now used in the courts of such state, saving to the courts of the United States in those states in which there are not courts of equity, with the ordinary equity jurisdiction, the power of prescribing the mode of executing their decrees in equity by rules of court." The law of Maine of 1821, having been in force at the time of the passing of this act of congress, it of course regulates the forms and modes of proceedings in the courts of the United States sitting in this state, as the state was admitted into the Union after the time mentioned in the act. According to the decision in the cases of Wayman v. Southard, 10 Wheat. [23 U. S.] 1; Ogden v. Saunders, 12 Wheat. [25 U. S.] 213, and more especially of Beers v. Haughton, 9 Pet. [34 U. S.] 329, the act of congress adopts the whole course of proceeding in a suit in the state courts, both mesne and final process, from its commencement to its termination. It must therefore include the practice of the state courts as to bail, as well the mode of taking bail as the extent of their liability and the manner in which they may discharge themselves. Id. 361.

If this then is to be considered as a proceeding at common law, and to be governed exclusively by the principles of that law and the practice of the common law courts, and it was in this light that it was considered by the counsel when it was first argued, it must be determined by the provisions of the state law of 1821. But can it be considered as a common law proceeding? The original suit, in the progress of which this bond was taken, was a libel in the admiralty, and the whole proceedings, from their inception to their close, were according to the course of the admiralty, and not according to the course of the common law. It is, therefore, as it appears to me, quite clear that it must be considered and treated not as a bail-bond at common law, but as an admiralty stipulation. It is true that it is in the form of a common bail-bond, but it also contains the substance of a stipulation that is familiar to the jurisprudence of the admiralty, though it is not the stipulation, which according to our practice is most usually taken. If this is to be considered and treated as an admiralty stipulation, then the state law of 1821 does not apply. The process act of 1828 adopts the state practice in courts of common law, and in part in courts of equity. But the states have no courts of admiralty, and consequently there could be no rules of practice, which could be adopted. But courts of admiralty have peculiar modes of proceeding and rules of practice adapted to the jurisdiction which they exercise and the nature of the controversies which are brought before them. The act, therefore, directs that the forms and modes of proceeding in courts of admiralty and maritime jurisdiction shall be "according to the principles, rules, and usages which belong to courts of admiralty, as contradistinguished from courts of common law." It seems, therefore, very clear that this stipulation having been taken in an admiralty suit, and being part of the proceedings in the suit, its nature and effect, and the obligations resulting from it are to be determined not by the rules of the common law, applicable to the analogous obligations by bail-bond, but by the rules and principles which govern courts of admiralty in relation to this subject. The jurisprudence of the courts of common law on the subject of bail-bonds, may furnish analogies, which deserve to be considered with the most respectful attention, but they cannot be considered as absolutely binding on the court.

If we examine the instrument, its principal object cannot be mistaken. The libellant had, in the exercise of his legal rights, caused the person of Jordan to be arrested, to be held as a pledge for the satisfaction of the judgment which he might recover. The bail, or fidejussors, as the friends of the respondent, take this pledge out of his hands; but before they are permitted to do it, they are required to enter into a stipulation that he shall appear and answer the libel, and abide the decision of the court; and if he fails to do it, they forfeit the penalty of the stipulation. There results from the stipulation against the bail, an alternative obligation, either to restore to the libellant his pledge, so that he may levy his execution upon him, or to pay the penal sum named in the stipulation, if the judgment is not otherwise satisfied. In this case, the respondent appeared and answered the libel; judgment was rendered against him, but when the execution was taken out, he was not to be found, nor any property of his by which it could be satisfied. They became, therefore, according to the terms of the stipulation, liable to pay the penal sum, or at least, so much of it as would satisfy the libellant's demand, and judgment must be rendered against them, unless the restoration of the pledge before judgment on this scire facias, or, in the language of the admiralty, this citation should be in equity considered as a substantial compliance with the terms of the stipulation. This question must be determined by the practice and jurisprudence of the court. I should have felt it as a great relief, if my judgment could have been enlightened by something like a settled course of decisions on this subject, but among the small number of reports of admiralty decisions in print, compared with those at common law, the researches of the counsel have found none bearing on the question raised in this case, and I have met with none in my investigation. I am brought back to general principles, aided by such analogies as the practice of the courts of common law furnishes in similar cases.

Under all systems of jurisprudence, courts feel themselves at liberty to deal with obligations of this kind with more freedom than they do with those which result from the

voluntary acts of the parties. In contracts, it is the intention of the party which governs, in giving a construction to the terms of the agreement, and when that intention is ascertained, if it is not in collision with any rule of law, the court is bound to carry it into effect. But the security, which is taken in the progress of a suit in court, for the purpose of sustaining and enforcing its jurisdiction and authority, is taken under the order of the court or of the law. Its terms are dictated by the law or the court, and as the will of the party is not consulted as to the tenor of the obligation, so his will or intention is not regarded in its interpretation. Such is the language of the civil law, which it is well known has had great influence over the jurisprudence, and more especially the practice of the admiralty. "In conventionalibus stipulationibus contractus formam contrahentes dant; enimvero praetoriae stipulationes legem accipiunt de mente praetoris, qui eas imposuit." Dig. 45, 1, 52. If, therefore, there is an ambiguity in the terms of the stipulation, or the construction of them is doubtful, it is not the intention of the party for which we are to inquire, for the will of the party had nothing to do in determining its conditions; the doubt must be removed by consulting the intention of the court, or the law which required the stipulation and dictated its terms. "In praetoriis stipulationibus si ambiguus sermo acciderit, praetoris erit interpretatio; ejus enim mens aestimanda est." Dig. 46, 5, 9; Voet, ad Pand. 46, 5, 1; Heinn. ad Pand. pars. 7, note 71; Domat, Lois Civiles, liv. 1, tit. 1, § 2, note 24. The courts of common law deal with the obligation of bail-bonds on the same principles. By the terms of the instrument at common law, the bond is forfeited, and the bail fixed by the return of non est inventus on the execution; and yet the courts have, notwithstanding, assumed the power of discharging the bail from the obligation, not as of strict right, but as of favor, on the surrender of the principal after the return, and after suing out but before final judgment on the scire facias. Mannin v. Partridge, 14 East, 599; Champion v. Noyes, 2 Mass. 482. Mr. Justice Story, in delivering the opinion of the court in the case of Beers v. Houghton, before referred to, observes that, "a recognizance of special bail being a part of the proceedings in the suit, and subject to the regulation of the court, the nature, extent, and limitation of responsibility created thereby, are to be decided not by a mere examination of the instrument, but by reference to the known rules of the court and the principles of law applicable thereto." And in another part of his opinion he adds, "so much are the proceedings against bail deemed a matter subject to the regulation and practice of the court, that the court will not hesitate to relieve them in a summary manner, and direct an exoneretur to be entered in such cases of indulgence"—that is, after the bail was fixed by the return of non est inventus, "as in cases of strict right." 9 Pet. [34 U. S.] 356–358. The obvious and sensible reason why the courts allow themselves such a latitude of discretion in these cases, is that the stipulation or bond is taken in the interest of justice by their order, for the purpose of giving effect to their own judgments; to prevent the defendant from depriving the plaintiff of the benefit of the judgment, by absconding and avoiding the process of the court. "Republicae intersit ne judicia fiant elusoria, et tamen reorum sit fugere." Heinn. Recitationes in Inst. 1. 4, t. 11–1. The surrender of the principal on the scire facias, though not a compliance with the letter of the bond, is considered as a substantial compliance with its intent, which is, that the person of the defendant shall be subject to the execution. What then was the intention, or the object intended to be effected by this stipulation? A court can have none but a legal intention, and this is to be sought in the usage and established jurisprudence of the court. The practice of the court is the law of the court, and in the want of any authoritative decisions, showing what that is on a particular point, we must resort to the general rules of admiralty practice, and the principles of that jurisprudence from which it is derived. By the act of congress of 1789, regulating the practice of the courts, the forms and modes of proceeding in causes of admiralty and maritime jurisdiction, are directed to be "according to the course of the civil law;" and in that of 1792, they are ordered to be "according to the principles, rules, and usages of courts of admiralty, as contradistinguished from courts of common law;" subject to such alterations as courts in their discretion should deem it expedient to make. The practice here referred to, says Mr. Justice Johnson, in the case of Manro v. Almeida, 10 Wheat. [23 U. S.] 473, is the admiralty practice of this country, as grafted on the British practice. It is known, he observes, that there are some peculiarities which have been incorporated into the jurisprudence of the United States. I am not, however, aware that our practice has any peculiarities in which it varies from that of the British, as to the nature and obligation of stipulations.

According to the practice of the high court of admiralty in England, when a person is arrested on a libel in personam, he is obliged to give bail or caution for his legal appearance, on the day and at the place named in the warrant, to answer the libellant in a cause civil and maritime. Clerke, Praxis, arts. 3, 24. The stipulation entered into on the arrest is only for his legal appearance, and to complete that appearance, he is required on the return day to enter into a new stipulation, to "abide the sentence (judicio sisti), to pay the costs and ratify the acts of his proctor." Clerke, Praxis, arts. 5, 12. When his legal appearance is completed, the first stipulation is satisfied, and the new one binds him to await and abide the decision of

the cause, to submit as well to all interlocutory orders as to the final decree. When the libellant has obtained a decree and the respondent absconds, so that he cannot be found to be taken in execution, the libellant may move for a motion to the fidejussors to pay the debt and costs within a certain day, to be named in the monition, or in default of payment to be taken into custody. The court in its discretion, pass the order for the monition on the motion, or order the principal to be called, and on his not appearing, order monition against the fidejussors. So if the principal has his home out of the kingdom or has no certain habitation within it, proof of this being given, or if it is notorious the court will, as soon as the time for prosecuting an appeal has elapsed, which in England is limited to fifteen days, order the fidejussors to be summoned to show cause why execution should not be issued against them without citing the principal. Clerke, Praxis, arts. 64, 65. This appears to have been the ancient practice of the high courts of admiralty in England, as we have it in the most approved books of practice, when it was in the familiar habit of acting on libels in personam, and before this branch of its jurisdiction was reduced within such narrow limits by the prohibitions of the common law courts. The object of the stipulation was to compel the appearance of the party, to hold him to abide the decision of the cause, and to submit himself personally to the final process of the court in execution. Execution was not issued against the sureties, provided it could be levied on the principal. Though by the terms of the stipulation, it was forfeited by the avoidance of the debtor, their liability was not fixed, but by a decree of the court against them directly; and the practice of the court was, not to render that decree without giving them a reasonable time for producing the principal. When the process is in rem, and the person in possession appears to defend the thing, the stipulation required is different. The claimant is required to enter into a stipulation with sureties. 1st. To appear from time to time and abide the sentence of the court—in judicio sisti. 2d. To ratify the acts of his proctor—de rato. 3d. To pay the judgment or sum decreed with costs—judicatum solvi. By the terms of this stipulation, the sureties and the party by his sureties, expressly submit to the jurisdiction of the court, and consent in case of default in the performance of the condition, that admiralty process shall issue against them. 2 Brown, Civ. & Adm. Law, 409.

Our practice is somewhat different. When a libel is filed in rem, whether in a petitory or possessory suit, a warrant is issued to the marshal, directing him to arrest the thing and hold it in his custody, to await the order of the court, and a citation is issued to the person in whose possession it is, and also to all persons claiming an interest in it, to appear and show cause why a decree should not pass in conformity to the prayer of the libel. On the return day, if any one appears as a claimant to defend, he is required, before being admitted to make a defence, to enter into a stipulation for costs, the thing in controversy remaining in the custody of the court. If the claimant wishes to have the possession restored to him, the court will pass an order for its restoration on his entering into an additional stipulation, in a sum equal to the value of the thing, to be ascertained by an appraisement, which stipulation, in the further proceedings, becomes a substitute for the thing itself; and if judgment passes for the libellant, it is entered on the bond or stipulation, and execution issues accordingly. The stipulation, as well for the costs as for the value of the property in controversy, binds the sureties equally with the principal party for the absolute payment of the amount decreed, and they cannot discharge themselves by a surrender of the principal. In libels in personam also, our practice is in some respects different from what appears to have been the practice of the high court of admiralty in England. By the third printed rule of this court, when a warrant of arrest is issued on a libel in personam, the respondent is required, in order to complete his legal appearance, to enter into a stipulation with fidejussors not only to appear and answer the libel, and abide all the orders and decrees of the court, interlocutory as well as final, but also to pay the judgment. The fidejussors are not discharged from the stipulation by surrendering the principal, but they are bound absolutely to pay the debt in case he does not. The same rule is adopted by the district courts of New York, and it is presumed to be in conformity with the general practice of the admiralty courts in this country. Conk. Prac. 437. It seems, therefore, that the prevailing practice in this country is to require, in libels in personam, security for the payment of the debt or damage, and such a stipulation is ordinarily taken in libels founded on contract, as for wages. But in libels for personal torts, as for assaults and batteries, the practice in this district has been not to require this stipulation, but to take one for the personal appearance of the party, binding him to await and abide the final decree of court, called, in the technical language of the court, the stipulation in judicio sisti. And such was the one taken in the present case. The counsel for the actor has referred to the practice of the court, in requiring security in ordinary cases to pay the judgment, and earnestly urged it as a reason for holding the parties to this stipulation, to a strict compliance with its conditions. The stipulation is substantially the same as a bail-bond at common law; and we have seen that if we are to be governed by the analogies of the common law, though the penalty is technically

forfeited by a return of non est inventus on the execution, yet that the surrender of the principal .by the sureties on the scire facias, is a substantial compliance with the condition of the bond. The principles of admiralty practice, as we have them in Clerke's Praxis, seem to me very clearly to lead to the same result, and this conclusion will be fortified by a recurrence to that system of jurisprudence which has had a prevailing influence over the course of proceeding in these courts.

The practice of the court of admiralty is framed on the basis of that of the civil law. It was observed by one of the most eminent of modern judges, Lord Hardwicke, "that the court of admiralty proceed entirely by the rules of the civil law, except in cases omitted, and therefore in that court, a knowledge of the ancient practice of that law is indispensably necessary, and must be had previously to the study of the modern practice of the court." 2 Brown, Civ. & Adm. Law, pp. 346–349. In this country we have seen that under the first process act, the course of the court was directed to be ac cording to that of the civil law. And what is material in the present case, the stipulations which are used in the admiralty are borrowed directly from the practice of the Roman forum. In the want of any authoritative decisions of our own courts, applicable to the case, it is natural to recur to that system of jurisprudence from which the practice of the court is derived; not that the decisions of the civil law are of binding authority, but the principles of that law may be reasonably expected to shed some light on the nature and obligation of an instrument which is borrowed directly from it. It is stated by Blackstone, in speaking of process in the common law courts, that bail above or bail to the action, answers in some measure to the stipulation or satisdatio of the Roman law. The defendant, he says, entered into a stipulation that he would continue in court and abide the sentence of the judge, much like our special bail, "but with this difference, that the fidejussors were there absolutely bound judicatum solvere, to see the costs and condemnation paid at all events." 3 Comm. 291. Brown, in his Admiralty Law, quotes Blackstone, and though a slight doubt seems to have crossed his mind as to the entire correctness of his authority, the doubt was apparently a transient one. Vol. 2, pp. 356, 412, in notis. The natural inference from the language of Blackstone, is, that a stipulation of this tenor was ordinarily, if not always, taken in a Roman suit; that it was the usual, if not the only stipulation known in their practice. If the fact were so, it would give weight to the argument urged on this ground, as going to show that the whole course of the jurisprudence, from which our practice is mainly derived was, to hold the defendant to give ample security. But, although it is well known that the laws of Rome, especial-

ly in the early ages of the republic, were extremely rigorous in enforcing the payment of debt, and notwithstanding the imposing authority of great names, it is, I think, exceedingly clear that the fact is otherwise. To make this evident, it may. be necessary to give a brief account of the commencement and progress of a Roman suit in its first stages.

The first step in legal process, was called "In jus vocatio," or the citation. This was originally the private act of the party. By the laws .of the Twelve Tables, tab. 1, c. 1, the creditor was authorized, of his own right, and without the authority of a precept from a magistrate, to seize his debtor in the street, or anywhere in public, and forthwith carry him before the praetor. The formula of citation was very brief, but quite intelligible: "Ambula in jus, te in jus voco, sequere ad tribunal." If he hesitated, or attempted to escape, struitve pedes, the creditor, calling the bystanders to witness, might seize and drag him, obtorto collo, to the judgment-seat. And such was the severity with which the rights of creditors were enforced, that the infirmities neither of age nor sickness were an excuse, but if he was relentless enough, the creditor might place the sick or aged debtor on a cart, and carry him before the praetor. Poth. Pand. 2, 4, 1; Heinn. Ant. Rom. L. 4, 6, 14; Rep. de Jurisp. Mot. "Citation." Huber. Prael. Inst. 1. 4, 16, 5. The primitive law of the Twelve Tables, continued in force for a long period. It seems to have been the common practice to the last age of the republic. Horace, Satires, 1. 1, sat. 9. It had not become obsolete in the time of Pliny (Panegyric, c. 36); and it remained apparently a legal mode of commencing a suit, nearly down to the age of Justinian, or it would not have been so largely treated by the compilers of the Digest (liber 2, tit. 4–7). It however gradually grew into desuetude, especially under the Greek emperors, until it was finally abolished by Justinian, and the more decorous practice of having the citation served by an officer of the court, was established by law. Heinn. In. Pand. pars. 1, 281; Voet, ad Pand. 2, 4, 13; Huberi, Prael. in Dig. 2, 4, 1.

In the early as well as the later practice of the Roman law, when the debtor was arrested by the creditor, unless he compromised with the plaintiff, or was prepared immediately to go before the praetor and answer to the suit, he was obliged to give a caution, usually with sureties or fidejussors, for his appearance at a future time. Leg. 12, tab. 1, c. 2; Poth, Pand. 1. 2, tit. 6; Gaii, Inst. 4, 134. This was called the stipulation in judicio sistendi. It was taken at the same time and for the same objects, as that taken in the present case. The defendant became bound, and his fidejussors for him, that he should appear at the time named in the stipulation, and that he should appear in eadem causa,' that is, that he should submit

himself to the jurisdiction of the court, as far as he was subject to it, when the citation was served. If, therefore, between the time of service of the process and the day of appearance, he had acquired a personal privilege of declining the forum, or excepting to the jurisdiction of the court, he did not appear, sistere in eadem causa, and the stipulation was forfeited. But it was not a forfeiture, if he had in the mean time contracted, new obligations, become embarrassed in his affairs, and less able to pay his debts. Dig. 2, 11, 12. The object of the stipulation was satisfied, when the party was personally subject to the process of the court. It was in its terms forfeited by the non-appearance of the party on the fixed day. But the tribunals admitted a variety of excuses. These show that the equity of the praetor went as far, at least, as the courts of common law, in relieving against the words of the stipulation, when its substantial objects were obtained. If the defendant was prevented from attending, by the duties of any municipal office (Dig. 2, 11, 2, § 1); or if he was required to be at another place as a witness (Dig. 2, 11, 2, § 3); or if he was detained by the order of a magistrate (Dig. 2, 11, 2, § 9); if he was condemned for a capital offence, whether to the punishment of death or exile (Dig. 2, 11, 4); if he was in prison or in military custody (Dig. 2, 11, 4, § 1); if he was a captive of the public enemy (Dig. 2, 11, 4, § 3); if his attendance was prevented by the death of one of his family (Dig. 2, 11, 4, § 2); and finally if he were detained by sickness, tempestuous weather, or a flood, "valetudine, tempestate, vel vi fluminis" (Dig. 2, 11, 2, § 3),— the praetor in all these cases relieved against the penalty, and the fidejussors were discharged. It may be stated in the form of a general proposition, that the forfeiture was never exacted when the non-attendance of the party was excused by any reasonable cause; and though the practice of the courts may have, in the course of time, fixed and limited the number and nature of these excuses, it is quite apparent that the Roman forum was even more indulgent in these cases, to the defendant, than the courts of common law. Parker v. Chandler, 8 Mass. 264. Under the ancient law, this stipulation bound the defendant merely to appear at the tribunal at the time fixed. It did not oblige him to attend and await from time to time the decision of the court. By his appearance alone, the stipulation was saved. This might answer the purpose of justice while it was administered with the promptness required by the laws of the decemvirs. These required the praetor to hear the cause before midday, and if either of the parties did not appear before noon, to proceed to a decision on an ex parte hearing before sunset. "Solis occasus suprema tempestas esto." Tab. 1, c. 3. The trial could not last longer than a day. When the refinements of wealth and civilization rendered controversies more complicated, and suits were drawn out to greater length, the terms of the stipulation were enlarged, so as to require the defendant to remain and await the decision of the cause, "Quod in judicio permaneat usque ad terminum litis." Inst. 4, 11, 2. This was the stipulation ordinarily entered into, and the only one which was required in a personal action when the defendant appeared and defended in his own person. He was never required to find fidejussors to pay the debt. Inst. 4, 11, 1, Vinn. in loc. Huberi Praelect. in Inst. 4, 11, 1.

The stipulation judicatum solvi, was never required in personal actions, except when a third person appeared and defended as procurator. We are not to understand by procurator, a proctor in the sense in which the word is used in the admiralty. He was not the advocate or patron, who managed the cause in court. He was the attorney or agent, acting under a special power or procuration. Dig. lib. 3, tits. 1, 3; Huberi Praelect. in Dig. lib. 3, tit. 1; Gaill, Pract. Obs. lib. 1, obs. 43. The reason why a proctor was required to enter into this stipulation, was founded in a peculiarity of the Roman law. Any person might appear and take upon himself as proctor, the defence of another's cause, without any mandate for that purpose. Vinn. in loc. Inst. 4, 11, 5. And when the cause was defended by a proctor, whether with or without a mandate, the joining of the issue, as it would be termed in our practice, or the litis contestatio, or susceptio judicii, as it is called in the civil law, operated what is technically called a delegation, the substitution of a new debtor for the old one. According to the subtlety of the law, the proctor became the debtor, and the original debtor was discharged. Vinnius in Instit. 4, 11, 1. He became dominus litis, had the control of the suit, and judgment was rendered against him. As any person had a right to come in as a volunteer, take upon himself another's defence, and substitute himself for the defendant, as debtor, he was required, as a preliminary step, to enter into a stipulation with sureties, to pay whatever should be adjudged to be due. If he undertook the defence without a procuration from the defendant, the judgment was not only against him in form, but he was compelled to pay it. If he was duly constituted proctor by a regular mandate, still from the time of contestation of the suit, he was technically considered as the debtor, and the judgment was in form against him. The stipulation was not the less required, for it was a universal rule that defence could never be made by a proctor, without a stipulation to pay the judgment. "Nemo alienae rei sine satisdatione defensor idoneus intelligitur." Gaii Inst. lib. 4, 101; Dig. 3, 3, 46, § 1, Code, lib. 2, tit. 57. But in this case the remedy on the judgment was denied by the equity of the praetor against the proctor, or in the language of our law, the judgment

against the proctor was enjoined, and execution was issued against the real debtor. Vinn. in Inst. 4, 11, 1, Dig. 42, 1, 4.

Until the reign of Justinian, the law with respect to stipulations in actions in rem, was different. The reason of the difference is found in the different nature of the actions. Personal actions, called condictions, are founded on some personal obligation, by which the defendant is bound to do some act, or render some payment to the plaintiff. In a personal action, therefore, the defendant was required to give security to appear and await the termination of the suit, that the plaintiff might have the means of compelling him personally to fulfil his obligations. But actions in rem, called vindications, were founded in a right of property in the subject of controversy, and were brought to recover the thing in specie, and lay only against the person in possession. Dig. 44, 7, 25. As the right of property was in controversy, the possessor was obliged to give security to surrender the thing or pay its value, if the decision was against him. Gaii Instit. L. 4, 88–94. But the distinction was abolished by Justinian, and the defendant was not required to enter into any other stipulation than that in judicio sistendi. Inst. 4, 11, 2, Vinn. in loc.[2]

Such appear to be the general rules with respect to these praetorian stipulations in the jurisprudence of Rome. A minute knowledge of the practice could hardly be expected to be acquired from such elementary works on the civil law as are preserved; and Tribonian, after giving an exposition of the general principles, refers the student for an accurate knowledge of details to the daily practice of the courts. Inst. 4, 11, 6. If Blackstone referred to the practice of the Roman forum, as he undoubtedly did, he certainly labored under a mistake, when he supposed the civil law in all cases required of the defendant a stipulation for the payment of the debt. In personal actions this was never required, except of a proctor defending another's cause, the reasons for which have been already stated. He seems to have taken the exception for the rule. As far as my inquiries have extended, he is equally mistaken, if he refers to the practice of those nations which have adopted the Roman law as the basis of their jurisprudence. The modern practice seems to be various with respect to these stipulations. But a usage generally prevails, introduced in favor of commerce, when a defendant is a foreigner and has no domicil within the jurisdiction of the court, to commence the suit by an arrest for

---

[2] Brown, in his Civil and Admiralty Law, devotes one chapter exclusively to the history and analysis of a suit as it was conducted in the tribunals of ancient Rome, as forming a natural and necessary introduction to an account of the practice of the admiralty. On the subject of the stipulations which were required in the progress of the suit in the practice of the Roman forum, he says that: "The cautions or securities were: Judicatum solvi. De judicio sisti. De rato. By the first the suitor engaged, if he lost the cause, to pay whatever sum should be condemned by the judge. By the second he gave security to abide the sentence; and latterly also to pay one tenth of the sum in dispute. By the third he engaged that the principal would confirm the acts of his proctor." Vol. 2, p. 356, note. This account of the stipulations in a Roman suit, is in some respects defective, in others loose, and in others singularly inaccurate. The first stipulation mentioned, judicatum solvi, was required of the defendant in some cases, but not generally; and takes its name from that which was its principal, but not sole object, that of securing to the actor the payment of the judgment. It contained three clauses, "De re judicata, de re defendenda, de dolo malo." By the first clause the defendant became bound, and his fidejussors for him, to pay the judgment forthwith; but in practice the exaction of the debt was postponed for a short time. By the second, the defence was required to be full and complete, "Boni viri arbitratu": and by the third, he stipulated against all fraud, "Dolum malum abesse et abfuturum esse." Huberi Praelect. ad Dig. 46, 7–1; Voet, ad Pand. 2, 8, 14; Dig. 46, 7, 6. The second stipulation, also, in judicio sistendi, was one required of the defendant, and was the one ordinarily required. It answered to a recognizance of special bail at common law, and was nothing more. But Brown says that latterly it bound him also to pay a tenth part of the sum in dispute, if judgment was against him. Now as this was a stipulation required only of defendants, and never of the plaintiff, if judgment was against

him, he was bound not only for a tenth but for the whole of the judgment, and if he gave security for paying it, it was by a stipulation of an entirely different character. The truth is, that Brown has confounded the common caution required of defendants, with one which, in a later age, was required of plaintiffs.

The temerity of suitors, or vexatious litigation by the ancient Roman law was restrained in three ways: First, by the action of calumny, or, instead of it, the defendant might require of the actor the oath of calumny. Gaii Inst. 4, 176. Second, by a pecuniary penalty in some cases; third, in other cases by the infamy of the judgment, as of tutelage, deposit, partnership, mandate, &c. Inst. lib. 4, tit. 16. The first, or the action of calumny, was the principal check on the temerity of plaintiffs, by which the defendant in the first action recovered against the plaintiff usually one tenth, but in some cases a fifth, and in others a fourth of the sum for which he was sued, by way of penalty, and as an indemnity for his costs and expenses in defending a groundless and vexatious suit. The civilians held that the plaintiff was not subject to costs, nor to any penalty by w· of indemnity to the defendant, except the action was vexatious and commenced without probable cause—"sine justa causa litigandi." Vinn. in Inst. 4, 16, 1, note 3; Gaill, Pract. Obs. L. 1, obs. 152; Heinn. Recitationes, L. 4, 16, 2. And this opinion, though not standing on any express text of the corpus juris of Justinian, is confirmed by the lately discovered commentaries of Gaius. "Calumniae judicio decimae partis nemo damnatur, nisi intelligit, non recte se agere, sed vexandi adversarii gratia actionem instituit." Gaii Inst. lib. 4, § 178. The action of calumny, therefore, the only remedy which a defendant ordinarily had to recover the costs of suit when judgment had been rendered in his favor, was nothing more nor less than an action of damages for a malicious suit. This action, having fallen into desuetude before the days of Justinian, was abolished by that emperor and the oath of calumny substituted in its place, by which the actor was re-

the purpose first of giving jurisdiction to the court against the maxim of the Roman law, "Actor rei forum sequitur"; and in the second place for securing the creditor in his demand. In this case the defendant will not be discharged from the arrest, but on his submitting to the jurisdiction of the court, and finding sureties in a stipulation to satisfy the judgment. But this practice is not allowed, except when the defendant is a foreigner, or is suspected of flight. Vinnius, Comm. in Instit. 4, 11, 7; Heinn. Recitationes in Instit. 4, 11, 3; Voet, ad Pand. 2, 8, 10, l. 2, 4, 18, 22; Huber Praelect in Inst. 4, 11, 5; Cocceius, Jus Controv. Civ. l. 46, tit. 7.

The stipulation ordinarily required in personal actions, that in judicio sistendi, answers more nearly to special bail than Blackstone supposed. Its object was substantially the same and nothing more, that of sustaining and rendering effectual the jurisdiction of the court against the person of the defendant. It was no part of its object to enable the actor to receive his debt of the fidejussors. When that was intended, a different stipulation was required. When its objects were substantially attained, the equity of the praetor relieved the fidejussors against the words of the instrument. If then the court is to be governed by the spirit of that jurisprudence, which is admitted to have exercised a controlling influence in regulating its practice, the inquiry will be, whether the plaintiff has had substantially the benefit of this stipulation. The person of the respondent in the original libel was surrendered as soon as the fidejussors were called on by legal process to surrender him, and the libellant has had an opportunity of taking him in execution, if he had chosen to do it. The courts of common law hold this to be a sufficient compliance with the condition of a bail-bond to discharge the bail. It is said, indeed, that in this case their discharge is ex gratia and not ex debito justitiae. But what was once favor and indulgence, by the practice of the court has been converted into a right. In this state, from the earliest period of its judicial history, the bail could always surrender the principal on scire facias, as a matter of right. This clear and strong expression of professional opinion, indicated by the uniform practice of the courts, that a surrender on the scire facias is such a performance of the condition of the bond, as in equity should discharge the bail, carries with it an authority not easily resisted. And if it is held sufficient to exonerate the bail by the courts of common law, it should, by at least as strong a reason, be

---

quired to swear to his belief in the goodness of his cause. Inst. 4, 16, 1; Vinn. in loc. Code 2, 59, l. 2, 6. After the publication of the Pandects he made this further provision against vexatious litigation, and required the actor, on filing the libel, to enter into a stipulation with sureties to bring the action to issue, litis contestationem, within two months (Novel. 96); 2d, that he would prosecute the suit to final judgment; 3d, that he would pay the defendant one tenth part of the sum demanded in the libel if it were adjudged eum injuste litem movisse (Novel. 112; Heinn. Recitationes, lib. 4, tit. 11), that he had commenced the action without probable cause, or vexatiously; for this is the interpretation which the civilians put upon the words of the Novel. This was nothing else than a stipulation for costs by way of penalty for commencing a groundless action, and so it appears from the Novel. sumptuum et expensarum nomine. It is therefore quite certain that Brown must have been entirely mistaken when he supposed that this made a part of the stipulation in judicio sistendi. The stipulation for costs was required of the actor or plaintiff; that to await and abide the judgment of the court, of the defendant only.

The author has fallen into a still more remarkable mistake with regard to the stipulation de Rato. By this, he says, that the principal engaged to ratify the acts of his proctor. By the term procurator, (proctor,) is meant nothing more than an authorized agent, acting under a procuration or power of attorney from his principal. A procurator ad litem is a person authorized to carry on and represent the principal in the suit. There is a manifest absurdity in requiring of a party a stipulation to ratify the acts of an agent whom he had already authorized to act for him; and the absurdity would be, if possible, greater in the civil than in the common law. There was, in the principles of the law, and in the forms and modes of judicial proceedings, an intrinsic difficulty in a suit's being carried on by any other person than the party himself. And the difficulties were only overcome by the fiction of supposing that the proctor himself became the real party. A mandate creating a proctor ad litem was construed to be not a simple mandate or power, but a transfer of the party's interest in the subject in controversy; and this imaginary transfer was supposed to be consummated by contestation of suit. From that time it was irrevocable, and the proctor became dominus litis. The proceedings were all in his name, and the judgment was in form for or against him. He was technically the party to all purposes, and the real party had no standing in court, at least according to the forms of law; though his rights were protected by the court. Heinn. Recitationes, lib. 4, tit. 10. The stipulation de Rato, as it was shortly called, or ratam rem habiturum dominum, was one required of the proctor of the actor or plaintiff, in all cases, and of the proctor of the defendant in actions in rem (Heinn. Pand. lib. 46, 7, § 75), by which he was required to give security that the principal should ratify his acts. It is the more extraordinary that a writer treating professedly of the practice of the civil law should have fallen into such an error, as this stipulation forms the subject of one entire title in the Digest (lib. 46, tit. 8). Vinnius contends that it was not required universally, but only when it was not clear whether the proctor was or was not authorized to act for the principal in the matter in question. Code 2, 13, 1; Vinn. in Inst. 4, 11, in princip. note 1. The reason given is, that if he had authority, the stipulation was unnecessary; if he had not, the judgment would not be binding on the plaintiff, and the defendant might be called on to litigate the same question again; "periculum enim est iterum dominus de eadem re experiatur." Gaii Inst. 4, 98; Justinian, Inst. 4, 11, in principio. If there was no question of the proctor's power to act for the principal, as if he had been constituted proctor in court apud acta (Code 2, 57); or if a written authority was in the defendant's hands, the stipulation was not required (Dig. 3, 3, 65; Huber. Prael. in Dig. lib. 46).

so held by a court of admiralty, which professes to administer justice ex aequo et bono in the liberal spirit of a court of equity. My opinion is, that judgment be rendered for the defendants, but the plaintiff is entitled to the costs of the citation.