## THE LYDIA.*

### HUGH D. MacKENZIE CO., Limited, et al. v. LYDIA S. S. CO. et al. (two cases).

(Circuit Court of Appeals, Second Circuit. June 2, 1924.)

Nos. 355, 356.

1. **Admiralty** ⬅️117—On appeal, case heard de novo.

Appeal in admiralty vacates decree of District Court, and case is tried de novo in Circuit Court of Appeals, and in accordance with rules of Circuit Court of Appeals.

2. **Admiralty** ⬅️50, 104—Stipulator held to have no right to intervene or appeal.

Stipulator for value and costs in suit in rem held to have no right to intervene, nor to appeal from decree, which, under practice in Second circuit, requires order to show cause against sureties and hearing before execution can be issued, since Circuit Court of Appeals has power to consider only appeals from final decrees in admiralty.

3. **Admiralty** ⬅️54—Addition of libelants held not to release stipulator's liability.

Addition of libelants in rem held not to release liability of stipulator for value and costs on claimant's bond.

4. **Admiralty** ⬅️18—Assignments ⬅️24(1)—Court has jurisdiction of suit in rem for conversion, and cause of action is assignable.

Admiralty court has jurisdiction of suit in rem for conversion, when committed on navigable waters, and cause of action is assignable.

5. **Courts** ⬅️7—Conversion transitory action.

Conversion is transitory action.

6. **Admiralty** ⬅️32—Cases in rem arising under general maritime law may be brought wherever vessel is found.

Cases in rem arising under general maritime law may be brought wherever vessel is found.

7. **Maritime liens** ⬅️1—For repairs and supplies arise under general maritime law.

Liens for repairs and supplies arise under general maritime law, though they are now most usually enforced under federal statute.

8. **Admiralty** ⬅️14—Prima facie suit in rem for supplies is within jurisdiction of United States District Courts.

Prima facie suit in rem for supplies furnished vessel on due request is within jurisdiction of United States District Courts, because it is suit in admiralty.

9. **Admiralty** ⬅️105—Denial of District Court's jurisdiction held not to raise question of British law not pleaded.

Where British law relating to maritime liens for supplies furnished vessel was not

*Certiorari denied 45 S. Ct. 97, 69 L. Ed. ——.

pleaded, denial of District Court's jurisdiction *held* not to raise question, within rule that point not raised below nor presented by pleading cannot be raised for first time on appeal.

**10. Shipping ☞76—Vessel's refusal to issue receipt for bunker coal held conversion.**

Vessel's refusal to issue receipt for bunker coal delivered to it *held* conversion.

**11. Insolvency ☞78—Foreign corporation's bankruptcy trustee held without authority in U. S.**

Trustee of Canadian corporation's property, appointed in Canada under local laws in some form of insolvency or bankruptcy proceeding, is virtute officii, without authority in United States, in absence of assignment from the bankrupt.

**12. Admiralty ☞54—Duty of stipulator for value and costs to respond to court.**

Duty of stipulator for value and costs in suit in rem is to respond to court, and, if court directs stipulator to pay one party rather than another, stipulator is protected, and cannot complain.

Appeal from the District Court of the United States for the Southern District of New York.

Libel in admiralty by the Hugh D. MacKenzie Company, Limited, and others, against the steamship Lydia, claimed by the Lydia Steamship Company, and another. From a decree for libelant Canadian Bank of Commerce, claimant and respondent appeal. Affirmed.

The amended libel in the first case asserts that in September, 1920, Hugh D. MacKenzie Company, Limited (acting either in its own behalf or in behalf of H. D. MacKenzie Company, Limited), delivered to steamship Lydia, at Port Hastings, Nova Scotia, 4,604 tons of coal "for transportation and delivery to the person or persons who should be named in the bill of lading to be issued therefor." The Lydia, having taken the coal on board, refused after due demand to issue any bill of lading therefor, but departed with the coal to New York, and thence conveyed the same to Europe and disposed of it in a manner unknown to libelants. The libel in substance asserts a demand in rem for the conversion, if not the larceny, of the coal.

In the second suit the same libelants assert that at the same time and place they delivered to the Lydia "1,139 tons of bunker coal for the reasonable and agreed value of $9,658.72." These bunkers were supplied upon the order of a person duly authorized by the owner, whereupon the Lydia sailed away to New York with the bunkers on board, and thence went to Europe and disposed of the coal in a manner unknown to libelants, without paying for it or even giving a bunker receipt, although such receipt was duly demanded. This libel asserts a claim in rem for necessary supplies.

The facts resulting in a record of singular and unnecessary complication are as follows:

The Lydia is an American vessel, owned by a New York corporation, and in April, 1920, the agent for her owner was the Susquehanna Steamship Company, apparently another domestic corporation. The exact nature of this agency does not appear, but it is plain that there was no demise of the vessel, and that at the times in question the master of the Lydia was the owner's master.

On May 1, 1907, there was incorporated under the laws of Nova Scotia a joint-stock company named Hugh D. MacKenzie Company, Limited. The purpose of this organization was to acquire the "whole or any part of the property, business, etc.," of a copartnership transacting business in Halifax under the name of H. D. MacKenzie & Co., and to carry on and continue said business.

On March 12, 1920, there was similarly incorporated under the laws of Nova Scotia another joint-stock company under the name of H. D. MacKenzie Company, Limited. This concern was empowered in effect to transact any lawful business, but among the stated objects of incorporation was "to acquire and take over the business as a going concern of Hugh D. MacKenzie Company Limited, together with any and all of the assets and liabilities of said company."

It is plain that the business of MacKenzie went on without interruption, and that there was oftentimes confusion in the use of the scarcely differing corporate names. It is said that many of the employees did not know of the creation of the "H. D." Company.

Certainly on this record the Hugh D. MacKenzie Company continued to transact business after the incorporation of the "H. D." Company, for this action grows, in a way, out of a contract formally made at Montreal on May 6, 1920 (i. e., some time after the formation of "H. D." Company), between *Hugh* D. MacKenzie Company and the British & Foreign Agencies, Limited, the latter being a Canadian corporation.

By this contract MacKenzie agreed to sell and the Agencies to buy some 50,000 long tons of coal to be delivered on board ship at Port Hastings. The terms of sale were that the price was to be "payable to the seller [MacKenzie] or upon his order in Canadian currency at a bank in the city of Montreal to be designated by the buyer [Agencies] on production of properly certified invoices in

triplicate, accompanied by weight certificates and clean bills of lading." In other words that Hugh D. MacKenzie Company was to be paid for the coal it sold, on producing, inter alia, clean bills of lading from the ship that took the coal at Port Hastings. It is necessarily implied that the bills referred to were to be transferable to the buyer on payment of the price.

It was to get this coal that Susquehanna Steamship Company had obtained what is throughout this record called the agency of the Lydia; for on April 23, 1920, Susquehanna Company made a contract in New York with the above-mentioned British & Foreign Agencies, Limited, whereby the Agencies agreed to furnish coal cargoes to the Lydia for six successive voyages from Port Hastings to divers European ports.

By this contract the Agencies agreed to provide the coal cargoes and to pay Susquehanna Company the agreed freight rate "on presentation of the original bill of lading in triplicate." This contract continues thus: "Said bill of lading, upon notice to [Agencies] of its being signed, to have the same force and effect as though not temporarily retained in the control of [Susquehanna Company] for the purpose of securing payments" of the agreed freight, and semble other provisions of the contract.

It being clear that the contract made by Agencies with Susquehanna provided for the shipping of the same coal that Agencies was to get from MacKenzie, it must be presumed (and there is no evidence to the contrary) that the bills of lading referred to in both contracts are the same bills of lading. This means that the contemplated method of getting the coal out of Nova Scotia and on its way to Europe was that the Lydia should issue clean bills of lading to MacKenzies, that Agencies would pay or secure the freight in order to get the bills into MacKenzie's hands, but MacKenzies would be entitled to the bills until through the Montreal bank they had been paid for the coal.

When the Lydia was ready at Port Hastings, MacKenzie filled her with coal, and at the request (in effect) of the master, provided her with bunkers. But under the agreement above referred to, between Agencies, Limited, and Susquehanna Company, the Lydia had a claim for demurrage. No portion thereof arose through any act or omission of MacKenzie, but on the theory that all the coal that had gone into the Lydia's hold and bunkers belonged to the British & Foreign Agencies, Limited, the steamship master refused to give either a bunker receipt or a bill of lading, and sailed away with the coal—not to Europe direct, but to New York.

Formal demand was made at Port Hastings, not only for bunker receipt, but for a clean bill of lading, and a form thereof was submitted, reciting the receipt of the cargo from "H. D. MacKenzie Company Limited," to be carried to New York and delivered to the order of shippers, "notify British & Foreign Agencies, Limited, Montreal." Such a bill of lading was entirely in accord with the three-cornered contractual arrangements between Agencies, Limited, Susquehanna Company, and MacKenzie, above outlined. The master refused to sign, and went to New York as a sort of way station for Europe, admittedly to avoid a then existing embargo on the exportation of coal to Europe. New York was an excuse, and the coal was taken to Europe, and there sold without breaking bulk. The bunkers were consumed in the usual way.

After the Lydia reached New York, Susquehanna Company offered to "Hugh D. MacKenzie Company Limited," a bill of lading similar in general tenor to that demanded by MacKenzie at Port Hastings, except that it left out the phrase, "Notify British & Foreign Agencies, Limited, Montreal," and inserted a statement that "this bill of lading is issued subject to a claim for $26,752, Canadian currency, now due by this cargo for demurrage, * * * and amount of demurrage is to be deducted before the payment for the value of the coal." MacKenzie refused this bill and brought the present suits.

With the exception of the offer last above recited, Susquehanna Company, exercising authority over the Lydia, treated both cargo and bunker coal as having been the property of British & Foreign Agencies, Limited, and finally bought it, paying pro tanto by the extinguishment of the demurrage claim, which had prevented Lydia's master from signing and delivering bunker receipt and clean bill of lading as demanded at Port Hastings.

Some time after libels filed, the existence as separate incorporations of the "Hugh" Company and "H. D." Company was noted. The latter concern also went into some form of insolvency, apparently bankruptcy, and a trustee was appointed for it under local laws, seemingly in Nova Scotia. It also then appeared that H. D. MacKenzie Company, Limited, had assigned to the Canadian Bank of Commerce, as collateral security, "all the

debts, accounts, and moneys due or accruing due, or that may at any time hereafter be due," and also all "securities ˙ ˙ * now held or which may hereafter be taken or held" by the assignor or by "any one on [its] behalf" in respect of the said debts, etc., due by Susquehanna Steamship Company to said H. D. MacKenzie Company, Limited.

These facts appearing, the court below permitted amendment to the original libels, so that the "Hugh" Company sues ut supra, "either on its own behalf or on behalf of" the "H. D." Company, and also allowed the joinder as parties libelant of the Canadian Bank and the trustee of the "H. D." Company. In each case stipulations for value and costs had been given on releasing the Lydia; National Surety Company, stipulator. The cases were tried together, and the court found in favor of the lien asserted in each suit; held that the Susquehanna Company was liable in personam, that the assignment to the Canadian Bank of Commerce entitled it to receive the amount of recovery under each libel, and that the Canadian Trustee for the "H. D. Company" was not entitled to any portion thereof.

Decrees accordingly in each case adjudged that the Canadian Bank of Commerce recover from the Lydia "and/or her stipulators for value" and from the Susquehanna Steamship Company substantially the amount sued for in each instance with interest and costs. Then in common form "ordered, that unless this decree is satisfied or an appeal is taken within ten days after the service of a copy of this decree upon the proctors for the claimant and respondents, with notice of entry thereof, the stipulators for value and for costs on the part of the claimant, and stipulators for costs on the part of respondents, will cause the engagement of their stipulations to be performed or show cause within four days * * *" why execution should not issue against their goods, etc.

From these decrees the parties claimant and respondent appealed generally, and so did the National Surety Company, the latter assigning error under numerous heads as if it had been the party claimant, and adding that error had been committed "in granting any decree against the stipulator for value, because said stipulator was released from the obligations of its stipulation by the amendment to the libel permitting the substitution of H. D. MacKenzie Company, Limited, for the Hugh D. MacKenzie Company Limited."

Edward H. Wilson and Alvin C. Cass, both of New York City, for appellants the Lydia and Susquehanna S. S. Co.

William J. Griffin and John M. Woolsey, both of New York City, for appellant National Surety Co.

Burlingham, Veeder, Masten & Fearey, of New York City (Ray Rood Allen and Frederic Conger, both of New York City, of counsel), for appellees.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1, 2] It must be emphasized that this appeal has vacated the decree of the District Court and that the case is here tried de novo (the John Twohy, 255 U. S. 77–79, 41 Sup. Ct. 251, 65 L. Ed. 511), although such new trial is conducted in accordance with our own rules. We have recently considered at length the rights of stipulators for value in suits in rem (The Cartona, 297 Fed. 827; The Buckhannon, 299 Fed. 519), and the same rules apply to stipulators for costs. National Surety Company had under these decisions no right to intervene, and no such effort was made; but it has substantially sought to intervene by appealing from the decrees entered. This cannot be done.

It is almost elementary that any one upon whom a judgment or decree directly, immediately, and necessarily operates may appeal from it so far as it affects himself. Thus it has been held that "the sureties on the stipulation (for value) are entitled to an appeal from any decree that may be rendered against them." Ex parte Sawyer, 21 Wall. 235–240, 22 L. Ed. 617. The decrees at bar were entered in the form common, if not universal, in this circuit, and the practice as it has been followed for generations is laid down in Benedict's Admiralty (4th Ed.) § 498. This form is even less stringent, so far as sureties are concerned, than that considered by the Supreme Court in the Sawyer Case, supra. That decree provided that, unless an appeal be taken, "a summary judgment" be entered in favor of the libelants against the sureties, naming them; whereas, under the practice followed here, it is necessary to issue an order to show cause against the sureties, and no execution can issue against them until after they have been heard and such objections as they may make have been overruled. Yet in the Sawyer Case it was held that the decree was not final and did not authorize an appeal. As we

have power to consider only appeals from final decrees in admiralty, it is clear that the surety company has no technical standing in this court.

The practice in the several circuits is not uniform in respect of methods of compelling stipulators to make good their stipulations. In the Fifth circuit a final decree seems to be in effect a final judgment against the stipulator by name, and it was held that such stipulator was a necessary party on appeal, unless a severance was had. The By-lands, 231 Fed. 101, 145 C. C. A. 289. The same practice seems to be followed in the Sixth Circuit, yet it was there held "that the sureties did not become parties to the suit in any such sense as to require their joinder in appeal." The New York, 104 Fed. 561, 44 C. C. A. 38.

To avoid, however, circuity and delay, we have considered the argument for the surety company and shall express opinion as to the stipulator's liability, without admitting any standing in this court, except that of amicus. The general principle regarding stipulator's liability was summarily laid down in Newell v. Norton, 3 Wall. 257, at page 266, 18 L. Ed. 271, viz. stipulators and sureties have no right to complain of any treatment of the res or any amendment of pleadings so long as their liability is neither increased nor diminished, and this is because "every person bailing such property is considered as holding it subject to all legal dispositions of the court." Citation might be extended, but the tendency to interpret admiralty stipulations in terms of common-law bail is quite noticeable. The matter was more fully considered in The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943. There the previous authorities were examined at length, with the result that interveners setting up wholly different causes of action were held unable to avail themselves of the stipulation given to answer the exigency of the original libel. In other words, a stipulation for value is given to secure only the demand propounded in the libel.

But that demand may be ill pleaded, or it may be propounded by a person who presently appears to be without full authority in the premises, and when it comes to changes naturally following from these conditions (one or both) the matter was fully gone into in The Beaconsfield, 158 U. S. 303, 310, 15 Sup. Ct. 860, 863 (39 L. Ed. 993): "Stipulations in admiralty are not subject to the rigid rules of the common law with respect to the liability of the surety, and so long as

the cause of action remains *practically* the same a mere change in the name of the libelant" does not discharge the stipulator. And the court particularly approved Judge Ware's remark in Lane v. Townsend, 1 Ware, 286, Fed. Cas. No. 8,054, to the effect that it is not into the intention of the party that one should inquire, but into the intention of the court or of the law which required the stipulation and dictated its terms.

[3] We turn now to the one assignment of error filed by the stipulator and above quoted, to the effect that it was error to grant any decree against the stipulator after the *substitution* of the "H. D." Company for the "Hugh" Company. This assignment would have been appropriate, had the appeal been taken by it from a decree finally made against it.

An answer on this record is that there never was any substitution. For all that this record shows, both these corporations still possess corporate existence. There is no evidence that bankruptcy or insolvency proceeding winds up a Canadian or Nova Scotian Company; that it has no such effect under our law is elementary. The "H. D." Company was brought in quite unnecessarily, as we think, but merely to insure its presence before the court as one on whose behalf the "Hugh" Company might continue the suit. Inasmuch as the contract out of which ut supra this whole trouble grew was made with the "Hugh" Company, we see no reason why that concern could not bring suit when it did, and continue the suit without any further multiplication of parties.

The argument for the surety appellant goes entirely beyond the assignment of errors, and asserts that "the procedure followed below has entirely changed the parties, the cause of action, and the risk." The change of parties may be summarily held to be no business of the stipulator. For this The Beaconsfield, supra, is sufficient authority, and The Horsa (D. C.) 232 Fed. 993, is a rather striking and extreme example of applying the doctrine that, as against the stipulator, it is the nature of the action that counts, and not the person who propounds it. These causes of action have never changed; they have always remained as first stated above, and the risk that the stipulator took was as to the view of the court concerning those causes of action, and not as to the court's opinions as to who might propound them, or own them at the end of the litigation.

Without recognizing the surety company

as a proper party appellant, it is our opinion that the stipulator is responsible, if the Lydia is.

Turning to the merits of the causes, the vital question is: Whose coal was it that went on board the Lydia, whether into her hold or her bunkers? The coal was laden under a contract with the "Hugh" Company; we have no doubt it belonged to that company for contract purposes. That concern was, and still is, so far as we know, an existing corporate entity; therefore, for the purposes of this suit, it owned the coal and had good right to sue.

[4] Suit in rem for conversion is by no means unknown to the admiralty nor to this court. The Hattie Palmer (D. C.) 63 Fed. 1015, affirmed 68 Fed. 380, 15 C. C. A. 479, is an instance under circumstances much less plain than the present. The reason for the exercise of admiralty jurisdiction is that conversion is a tort, and a tort so elementary in its nature that it may be maintained even against an infant (Vasse v. Smith, 6 Cranch, 226, 3 L. Ed. 207), and if that tort is committed on navigable waters, admiralty has jurisdiction.

[5] Furthermore the cause of action arising out of tortious conversion of property is assignable, as was summarily held under very unusual circumstances by this court in United States v. Ferguson, 78 Fed. 103, 24 C. C. A. 1. Furthermore, conversion is a transitory action. Compania v. Mexican, etc., (C. C. A.) 292 Fed. 846.

[6] The doctrine of venue in the admiralty is not like that of common law, but the same result is reached by the common holding that cases in rem arising under the general maritime law may be brought wherever the vessel is found.

[7, 8] As to the action for bunkers, probably the court below gave decree on the theory that the libel asserted a demand for necessaries or supplies. It is now urged that, since there is no lien for supplies under British law, the libel cannot be sustained. It needs no citation to show that the courts of this country have always regarded liens for repairs and supplies as arising under general maritime law. That they are now most conveniently and most usually enforced under a statute of the United States does not change the truth of the statement made. Prima facie, in our courts, suit in rem for supplies furnished on due request is within the jurisdiction of the United States District Courts, because it is a suit in admiralty.

[9] In this instance the British law was not pleaded, and no point was made of that law in the court below. It is now said that the denial of jurisdiction raised the whole question, even though no argument was made to the point. The matter must be treated as in The Buckhannon, supra, a somewhat similar situation. The formal denial of jurisdiction did not raise the question, both on principles of pleading and because the court had jurisdiction to hear and adjudicate the case. That it might have adjudicated the matter differently, had the pleadings been different, does not raise a question of jurisdiction. In short, the matter is within the familiar principle that a point not raised below, nor presented by the pleading, cannot be raised for the first time in this appellate court. The Minnie, 225 Fed. 36, 140 C. C. A. 362; Jova, etc., Works v. New York (C. C. A.) 277 Fed. 180.

[10] There is, however, another ground upon which the recovery for bunkers is properly sustainable. When the Lydia refused a receipt for bunker coal, it refused even to acknowledge the character of that shipment or lading. It used its bunkers merely as an excuse for getting the coal on board, and then ran away with it. This was a conversion just as much as, and perhaps a little more flagrant than, that of the cargo.

[11] The position of the Canadian trustee is a question merely academic. He has been held to be without any right or title in the premises because the rights to which he might have succeeded were gone before he came into being, by an assignment to the Canadian Bank. Therefore we merely point out that virtute officii he would be entirely without authority in this country, though he might obtain it by an assignment from the bankrupt. Remington on Bankruptcy (2d. Ed.) § 1114.

[12] It remains to consider the position of the Canadian Bank of Commerce. In substance, after hearing evidence, and without any objection from either of the MacKenzie Companies or the trustee in bankruptcy, the court below has held that the Canadian Bank is entitled as owner to the recovery that should be granted. This is a point in which again the stipulator is not concerned in any way. The duty of the stipulator is to respond to the court; indeed, historically the foundation of a stipulator's obligation rests in an open, public, and final submission by the stipulator to the court's jurisdiction. Therefore, if the court ultimately directs the stipulator to pay one par-

ty rather than another, the stipulator is protected, and that is all that can be asked.

The claimant and respondent were brought into court to answer the demands of the MacKenzie Companies, either or both. The Canadian Company was joined as a party libelant, not because it had a cause of action, but because it had come to own the cause of action. It is enough for us that the party who had the cause of action and brought the suit is satisfied to admit that what it used to own the Canadian Bank now owns. Therefore, to avoid assignments or other circuity, the decree might just as well pass in the name of the company which is now the real party in interest.

Decrees affirmed, with costs, said costs to be paid, one-half by claimant and respondent, and one-half by National Surety. Company.