## NEWELL *v.* NORTON AND SHIP.

1. A libel *in rem* against a vessel and personally against her master may properly under the present practice of the court be joined. And if the libellant have originally proceeded against vessel, master, *owners, and pilot*, the libel may with leave of the court be amended so as to apply to the vessel and master only in the way mentioned.

2. Such an amendment, neither increasing nor diminishing their liability, will not discharge the sureties to the usual bond given on release of a vessel seized by process of the admiralty.

3. A person who is master and part owner of a vessel in which a cargo has been wrongly sunk by collision from another vessel, may properly represent the insurer's claim for the loss of the cargo, and proceed to enforce it *in rem* and *in personam* through the admiralty.

The court, seeing no reason to doubt the correctness of a decision below, again declares what it has often before decided, that it will not reverse from doubt where the issue is one entirely of fact, depending on the credibility of witnesses who differ in their statements, and where the District and Circuit Courts have concurred in viewing the merits. And it announces emphatically that in cases where both courts below concur, parties need not bring appeals here with the expectation of reversal because they can find in a mass of conflicting testimony enough to support the appellant's allegation if the testimony of the other side be wholly rejected, or by attacking the character of witnesses and so raising a mere *doubt* as to what justice required.

THIS was an appeal from a decree of the Circuit Court for Louisiana *affirming a decree of the District Court* in admiralty in a case of collision between the steamboats Hill and World.

The owner of the World filed his libel in the District Court, March 12, 1863, setting forth that his vessel, sailing down the Mississippi and laden with a valuable cargo, had been lost by collision with the Hill, and solely through the fault of the Hill.

The collision out of which the proceeding came, took place in a bend of the Mississippi below the town of Princeton, Mississippi. The Hill received no material injury. The World sank almost immediately, carrying down with her about thirty persons. *The wreck and cargo were soon afterwards abandoned to the underwriters:* who subsequently assigned their claims to the libellant.

The account of the catastrophe, as given by the libellant, was briefly this: that the World was descending the river in the ordinary channel, when the Hill, which had been running up on the Mississippi side, came quartering out from that side, attempted to cross the river in front of the descending boat, but, being a little too late, ran into her and sunk her.

The libellant accounted for the accident on the ground

that the pilot of the Hill failed, for want of proper watchfulness, to discover the World in time to avoid the collision; that he was either ignorant or disregardful of his obligations to obey signals which he ought to have obeyed; and that he manœuvred his boat with entire want of skill.

The respondent admitted an attempt of the Hill to cross the river, but asserted that it was effected in safety, and that, after the Hill had gained the Arkansas side, the World came square across the river, directly towards the Hill, struck her, inflicting, however, no damage, but was herself by the blow stove in and sunk.

The District Court, *in accordance with the prayer of the libel,* issued process *in rem* against the Hill, and citations *in personam* against the captain, owner, and pilot. The 15th rule in admiralty of this court, of the Rules of 1845,* it should be said, allows a libellant, in all cases of collision, " to proceed against the ship *and* master, or against the ship alone, or against the master or the owner alone, *in personam.*"

The owners of the Hill, of *whom the master was one,* put in a claim, and on the same day the boat was released on a bond, conditioned that *the claimants and sureties should abide by all the orders of the court, and pay the libellant the amount awarded by the final decree.* The claimants immediately afterwards filed an exception to the libel for misjoinder of owners and pilot in a proceeding against the vessel and master, and prayed that the libel be dismissed. The court ruled that an action against the owners and pilot could not be joined with the proceeding *in rem,* and that the libellant must elect which remedy he would pursue; and he having elected to proceed *in rem* against the steamboat, and *in personam* against the master, it was ordered that the libel be dismissed as to the owners and pilot, and sustained against the steamboat and master. Proofs were then taken.

The testimony was voluminous and conflicting. With the documents it filled a book of three hundred and ten pages of long primer, " solid." One hundred and ten persons, first-

---

* 3 Howard, vi.

and last, and through a term of five years that the case was
in the courts below, were examined. It embraced a num-
ber of questions, as whether a sufficient watch had been
kept—sufficient and proper signals given—whether the en-
gines had been rightly worked when the boats approached—
whether certain officers of the World were or were not in-
toxicated—what was the character of the pilots for sobriety
and skill—and whether Henry Evans, " a flatboat pilot" on
the Mississippi, who saw the collision and testified strongly
that the Hill was to blame for it, was worthy of faith—seven
persons swearing that he was not, and twenty-two that he
was. And finally, whereabouts exactly in a bend of the river
the collision took place, and what topographical inference
could be made from the hydrographical fact that portions
of the World's cargo had floated to a particular spot of the
shore; and that cattle which had been on the boat were
found the next morning walking contemplatively in the State
of Mississippi and not in the opposite one of Arkansas.

The District Court decreed for the libellants ($52,500); *a
decree* which the Circuit Court, on full consideration and
after giving an opinion at large, which the record contained,
*affirmed* with interest and costs.

After the decree in the Circuit Court a motion was made
for a re-hearing, " upon the ground that the court had erred
in its view of the evidence, and that the damages ought to
be apportioned." This motion was refused; Campbell, J.,
who gave its opinion, saying:

" I have considered the evidence with much care; it is very
conflicting; and an opinion founded upon one portion of it must
necessarily be hostile to conclusions which have their support in
another portion. I think it is a case in which men may natu-
rally form different conclusions, *and that an appeal is a very
proper remedy for the party who is aggrieved. A re-hearing of the
case would not speed the cause to its final determination;* and, upon
the suggestions that the decree is erroneous, I do not think 1
should be authorized to allow a re-hearing."

The case was now here on appeal.

*Mr. Speed, A. G., and Mr. Ashton, acting as private counsel, for the appellants:* It has never been decided nor recognized as a principle of admiralty practice that the misjoinder of actions can be cured by putting the libellant to his election. The libel ought to have been dismissed, and then the party asserting himself to be aggrieved could have filed his libel rightly. Before the adoption of the admiralty rules of 1845, the proceeding *in rem* could not be joined with a suit *in personam;* and the right to unite these distinct remedies in the same libel is given solely by virtue of these rules. By authorizing the two remedies to be blended in the same libel they made an innovation in established practice, and the libellant must have complied literally with their provision. The amending of a libel, all wrong originally, was improper.

2. *As respects the discharge of the sureties.* The boat was not seized again after the change in the libel, and no new bond was given or required. The sureties bound themselves with reference to the libel. The contract of suretyship is *stricti juris,* and cannot be extended by implication.* The undertaking of the sureties was to satisfy such decree as might be rendered upon the libel filed, under which the vessel had been seized; and it is obvious that no other decree could have been rendered upon the libel, in its original form, than one of dismissal. If the libel was not authorized by law, if, in fact, as was the case, it was in direct violation of the law and the rules adopted by this court governing proceeding in the admiralty, the seizure and detention of the boat were illegal *ab initio;* and the bond given for her release was without consideration and void.

When, therefore, the libellant elected to proceed *in rem* against the vessel, and *in personam* against the master alone, he attempted to place the sureties *in duriori casu* than that contemplated by them at the time they contracted as sureties, and to change the obligation which they had assumed, which was to satisfy such decree as might be rendered upon the·

---

* Smith *v.* United States, 2 Wallace, 219.

libel filed, into an obligation to respond to a decree to be rendered upon a new libel, freed from the objection which -made that with reference to which they had bound themselves void; an obligation to which the sureties in no manner have assented. Of course they are discharged.

3. *The libellant here but represents the underwriters, or the vessel and cargo.* Now can a claim for damages resulting from a collision be assigned so as to convey to the assignee the lien which may have existed in favor of the assignor, and to vest in the assignee the right to proceed in the admiralty in his own name for reparation for a wrong which was not done to him nor to his property? We think not. The admiralty has no jurisdiction unless the contract which the libellant seeks to enforce is maritime. A contract may be maritime, but it would by no means follow that the assignment of that contract must also be maritime. An assignment is not and never can be a maritime contract; it is always an ordinary civil contract. Maritime liens are not established by the agreement of the parties, except in hypothecations of vessels, but they result from the nature and object of the contract. They are consequences attached by law to certain contracts, and are independent of any agreement between the parties that such liens shall exist. They, too, are *stricti juris.* Indeed, the only power the contracting parties have respecting such liens as attach as consequences to certain contracts is, that the creditor may waive the lien, and may by express stipulation, or by his manner of dealing in certain cases, give credit exclusively to those who would also have been bound to him personally by the same contract which would have given rise to the lien.

4. *As to merits.* [The learned counsel here proceeded to collocate and present the evidence, so that it bore in a strong way against the World; and argued that, rightly considered and according to the weight of the evidence, reference being had to the character of the witnesses as sworn to for truth, the fault was with that vessel, not at all with the Hill.]

*Messrs. Carlisle and McPherson, contra:* This libel is not multifarious within a proper definition of the term. It states but one cause of action, and seeks but one measure of relief. And it is a proof of this, that if any one of the defendants would satisfy the demand set forth against him, it would be a satisfaction of the whole cause of action.

The real defect of the libel was in making parties of persons who could not be made liable in that form of action. It was a misjoinder merely, and so a defect of form. What, then, should have been the ruling of the District Court? The claimants say, to have dismissed the libel as to all the parties. But this court said, in the case of *The Schooner Adelide:** "When merits clearly appear on the record, it is the settled practice in admiralty proceedings not to dismiss the libel, but to allow the party to assert his rights in a new allegation." So in *The Commander-in-Chief*† they said: *"Objections to parties, or for want of proper parties, should be made in the court below, when amendments may be granted in the discretion of the court. Parties improperly joined may, on motion, be stricken out, and new parties may be added by a supplemental libel and petition."*

But it is further objected that, by allowing the libellant to amend, or dismissing the bill as to certain parties, injustice was done to other parties—to the sureties; who, having agreed to abide the result of a libel which could not be sustained, have to abide the result of one which has been thus freed from objection. The same objection was raised in the case of *The Harmony*,‡ but was not held of force. It was there observed, that it would not have force in a common lawsuit; and *à fortiori* would find no support in a court exercising admiralty jurisdiction.

It being then established that the libel was not to be dismissed, the next question was, who were the improper parties, and how to get rid of them? The District Court ruled simply that the libellant could not proceed against all whom he had made parties, and left it to himself to select those

---

* 9 Cranch, 244.    † 1 Wallace, 352.    ‡ 1 Gallison, 125.

whom he would pursue. He made his election, and then the court made the order which it did. This, we suppose, was in substance an amendment of the libel; and, if it was, no question can be made to it here.*

The objection, that the libellant cannot proceed in the face of an abandonment to the underwriters, is without force. As owner of a steamboat employed in transporting goods generally, the libellant was a common carrier and bailee, and liable to the shippers. In the case of *The Commander-in-Chief*, above cited, this court intimated, that where the libellant was prosecuting for the benefit of other parties not named, as well as his own; it would be more regular that it should be so averred in the libel; still they overruled the objection for want of such an averment, observing that no inconvenience could result from the rule, as there was ample power in the court to protect the rights of shippers, who may intervene at any time before the fund is actually paid out of the registry. And, indeed, the specific defence, founded here on the dealings between the libellant and the insurers or owners of the cargo, is disposed of by the ruling of this court in the case of the *Propeller Monticello* v. *Matteson*,† with which the bar is familiar.

*The merits.* It is impossible that a more ingenious argument could have been made on the evidence than has been. All that careful collocation of the facts, and skilful presentation can do, has been done. But we shall not respond largely to that sort of argument. The case is one of fact only; and where, on a deal of conflicting testimony, two courts from which appeals have been taken have decided in one way, this court will not easily reconsider. This court is already overburdened with business. It has more than it can do in passing upon the great causes which properly belong to it; upon those momentous questions which arise from our civil war; those great questions of national law which arise in time of peace; questions of the rights of foreigners; questions of the conflicting claims of States; of

---

* Spencer *v.* Apsley, 20 Howard, 264.          † 17 Howard, 152.

the effect of State laws and of State decisions upon rights claimed under the United States, and on interests which are supposed to be put beyond the reach of State legislation by, the Constitution of the United States. Mingled with which come of necessity questions of commercial, social, domestic, and other *law;* all of which it must pass on; questions than which, when considered in their immense magnitude and number, it is impossible to conceive of any more various, greater, or of higher dignity.

With what propriety, then, is this court so constantly vexed with these questions of fact? called on to settle issues of *ebrius vel non* between two deck-hands of a Mississippi boat; and to announce to the bar of the civilized world *its* solemn judgment on the point, whether a half-tipsy sailor saw or did not see, of a dark night, down a distant river, a particular signal, which another sailor, a little more or less tipsy than himself, raised or did not raise for him to look at? A common jury, it is no offence to this court to say, could decide the case as well. The District and Circuit Courts, which have more leisure to hear, and completer power to examine witnesses, better. The decisions are unintelligible when reported, and would be worthless if understood. Of what importance is it to the law as a science, whether, on a certain night, a certain boat-hand—as to whose having been intoxicated ten persons swear one way, and ten others swear another and opposite way—trimmed or did not trim his lamp-wicks in the way in which he ought to have trimmed them? or whether a second boat-hand shouted or did not shout as loud as he ought to have shouted, "Halloa there! Take care!"? Who on earth but the parties to the very suit care for such decision when made? And of what interest even to them is an opinion which shows, though incontestably, its rectitude? The court has laid down principles, in accordance with ancient rules of law, that should keep such cases out of this place, and which quite relieve us from largely following the able arguments opposite, so far as they apply to facts only. *The Ship Marcellus* is in point.*   Grier,

---

* 1 Black, 417; and see the able argument in The Cornelius, *supra*, p. 214.

J., there declared, in behalf of the Bench, that any appellant coming here on cases of this sort has "*all* presumptions against him."

*Reply:* If the argument of the other side would have force in any case so long as statute gives appeals here as well as writs of error, it can have none in this case. The court below refused to hear us fully, because "the case was one on which men might naturally form different conclusions;" and because, therefore, "appeal" and not "rehearing" was the proper remedy. We were sent *to* this court by one of its then justices specifically, because of the conflict of testimony, and the learned counsel would now send us *out* of it for the precise same reason. Certainly, we ought to be heard, and to have justice, somewhere. But between the upper and the nether courts, if such views as the opposite counsel would enforce prevail, justice would, in cases like the present, be surely ground to powder.

Mr. Justice GRIER delivered the opinion of the court.

The libel in this suit was originally against the steamboat Hill, and against the master, who was part owner, and, also, against the pilot. It was amended in the District Court by dismissing it as to the pilot, and sustained as against the vessel and the master, or owner. The allowance of this amendment was within the discretion of the court, and was very proper. The objection that a libel *in rem* against a vessel, and *in personam* against the owner, cannot be joined, was properly overruled; as it was in conformity with the 15th rule in admiralty as established by this court.

It has been objected here, that the allowance of the amendment was injurious to the sureties in the bond given for the property. But this objection is without foundation, as their liability was neither increased nor diminished. "Every person bailing such property is considered as holding it subject to all legal dispositions of the court."*

---

* The schooner Harmony, 1 Gallison, quoting King *v.* Holland, 4 Term, 459.

It has been contended, also, that the right of the libellant to sustain this action ceased by his abandonment to the underwriters. The Circuit Court very properly ruled, that as the libellant was the owner and master of the steamer World he was the bailee of the cargo, and so responsible to the shippers or insurers for the safe transportation and delivery thereof, and to fulfil his obligations and secure his reward, he was entitled to possession, and might maintain an action for its destruction.*  " The respondent is not presumed to know or bound to inquire as to the relative equities of parties claiming the damages. He is bound to make satisfaction for the injury he has done. When he has once made it to the injured parties, he cannot be made liable to another suit at the instance of any merely equitable claimant."†

The question of merits was the next question argued.

During the five years in which this case was pending in the District and Circuit Courts, more than a hundred depositions have been taken. In these there is the usual conflict of testimony which always attends such cases. The issue is one entirely of fact, and depending on the credibility of witnesses. The District and Circuit Courts, after patient investigation of the testimony, concur in the opinion that the libellant has fully established his case. The record contains the opinion delivered by the learned judge of the Circuit Court, which fully vindicates the correctness of his decree.

It would be a very tedious as well as a very unprofitable task to again examine and compare the conflicting statements of the witnesses in this volume of depositions. And, even if we could make our opinion intelligible, the case could never be a precedent for any other case, or worth the trouble of understanding.

It is enough to say that we find ample testimony to support the decision, if believed; and that we again repeat, what we have often before decided, that in such cases, par-

* See The Propeller Commerce, 1 Black, 582.
† See Monticello *v.* Mattison, 17 Howard. 152.

ties should not appeal to this court with any expectation that we will reverse the decision of the courts below, because counsel can find in the mass of conflicting testimony enough to support the allegations of the appellant, if the testimony of the appellee be entirely disregarded; or by attacking the character of his witnesses when the truth of their testimony has been sustained by the opinions of both the courts below. Parties ought not to expect this court to revise their decrees merely on a doubt raised in our minds as to the correctness of their judgment, on the credibility of witnesses, or the weight of conflicting testimony. In the present case we see no reason to doubt the correctness of the decision of the Circuit Court, which is accordingly

AFFIRMED WITH COSTS.