**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-1498

_____

In re: WORLD IMPORTS LTD., et al.,
Debtors


WORLD IMPORTS, LTD.; WORLD IMPORTS CHICAGO,
LLC;
WORLD IMPORTS SOUTH, LLC; 11000 LLC

v.

OEC GROUP NEW YORK,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:13-cv-05085)
District Judge: Hon. Petrese B. Tucker

_____

Argued
November 3, 2015

Before: McKEE, *Chief Judge*, JORDAN, and VANASKIE,
*Circuit Judges*.

(Opinion Filed: April 20, 2016)

_____

Dean E. Weisgold
Dean E. Weisgold PC
1835 Market Street, Suite 1215
Philadelphia, PA  19103

Brendan Collins   [ARGUED]
GKG Law, PC
1055 Thomas Jefferson Street, NW, Suite 500
Washington, DC  20007
        *Counsel for Appellant*

David L. Braverman   [ARGUED]
John E. Kaskey
Brian J. Discount
Braverman Kaskey, P.C.
One Liberty Place, 56th Floor
1650 Market Street
Philadelphia, PA  19103-7334
        *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

In a bankruptcy proceeding, OEC Group, New York ("OEC") asserted maritime liens on goods then in its possession, and it now appeals a ruling of the United States District Court for the Eastern District of Pennsylvania that certain contractual modifications to those liens were unenforceable. Because we conclude that the modifications were enforceable as to goods then in OEC's possession, we will reverse and remand for the District Court to craft an appropriate remedy.

## I.    Background

Although the parties dispute the legal consequences of the facts, what happened is not in dispute. World Imports, Ltd., World Imports Chicago, LLC, World Imports South, LLC, and 11000 LLC (collectively, "World Imports")[1] are business entities **[A 206]** that buy furniture wholesale and sell it to retail distributors. OEC provided non-vessel-operating common carrier transportation services[2] to World Imports for approximately five years, including services to ensure that cargo was delivered from countries of origin to World Imports' warehouse or to other United States destinations designated by World Imports.

---

[1]  For convenience we refer to the several World Imports debtor-entities together in the singular.

[2]  A non-vessel-operating common carrier "is a consolidator who acts as a carrier by arranging for the transportation of goods from port to port." *Logistics Mgmt., Inc. v. One (1) Pyramid Tent Arena*, 86 F.3d 908, 911 n.1 (9th Cir. 1996) (internal quotation and editorial marks omitted).

3

## A. Supporting Documents

On or about January 26, 2009, World Imports, Ltd. entered into an Application for Credit with OEC (the "Application"). Page two of the Application, titled "Notice Concerning Limitation of Liability," was signed by the vice president of World Imports, Ltd. and included the following language:

> [OEC] has adopted general terms and conditions of service. These terms and conditions are printed on the back of or accompany every invoice issued by [OEC] and are incorporated herein by reference. … When [OEC] is acting as a carrier, the exact limits of liability and the other terms and conditions of carriage can be located on the ocean bill of lading or other shipping document such as the airway bill issued by the carrier (which is the contract between the parties). Unless modified or superseded by the terms of the bill of lading or other contract of carriage, [OEC's] general terms and conditions of service will also apply to the transaction. However, the terms of the bill of lading prevail in all cases.

(A 40.)

Page three of the Application, titled "Terms for Credit Accounts," was signed by the bookkeeper of World Imports, Ltd. and said:

Specific terms and conditions of service … apply to the services performed by [OEC]. These terms and conditions are established by contract as set forth in the governing instrument or by operation of law. [OEC's] standard payment terms require receipt of cash in advance of performance. In the event that [OEC] extends credit to [World Imports], which is defined as permitting [World Imports] to pay for service within a specified period of time after performance by [OEC], [World Imports] agrees that the following additional terms are applicable. …

As security for *any existing and future indebtedness* of [World Imports] to [OEC], including claims for charges, expenses or advances incurred by [OEC] in connection with any shipment or transaction of [World Imports], and whether or not presently contemplated by [World Imports] and [OEC], [World Imports] hereby grants to [OEC] a general lien and security interest in any and all property of [World Imports] (including goods and documents relating thereto) then or thereafter in [OEC's] possession, custody or control or en route (the "Collateral"). This general lien and security interest shall be in addition to any other rights [OEC] has or may acquire under other agreements and/or applicable law, *and shall survive delivery or release of any specific property* of [World Imports]. …

(A 37 (emphasis added).)

For each container of goods it transported for World Imports, OEC provided to World Imports an invoice (the "Invoice") which contained, in its "Terms and Conditions of Service," the following provisions:

> These terms and conditions constitute a legally binding contract between the "Company" [*i.e.*, OEC] and the "Customer" [*i.e.*, World Imports].
>
> …
>
> 14. General Lien and Right to Sell Customer's Property.
>
> (a) Company shall have a general and continuing lien on any and all property of Customer coming into Company's actual or constructive possession or control for monies owed to Company with regard to the shipment on which the lien is claimed, *a prior shipment*(s) and/or both … .

(A 42 (emphasis added).)

As required by federal law, OEC also publishes a tariff (the "Tariff") with the Federal Maritime Commission, which governs its shipments. Included with the Tariff is a Bill of Lading whose terms and conditions provide, in pertinent part, as follows:

17. CARRIER'S LIEN

The Carrier shall have a lien on the Goods, inclusive of any Container owned or leased by the Merchant and on all equipment and appurtenances thereto, as well as on any Charges[3] due any other person, and on any documents relating thereto, *which lien shall survive delivery, for all sums due under this contract or any other contract or undertaking to which the Merchant was party* or otherwise involved, including, but not limited to, General Average contributions, salvage and the cost of recovering such sums, inclusive of attorney's fees.  Such lien may be enforced by the Carrier by public or private sale at the expense of and without notice to the Merchant.

(A 54-55 (emphasis added).)[4]

---

[3] As defined in the Tariff, "Goods" referred to "the cargo received from the shipper" and "Charges" referred to "freight, deadfreight, demurrage and all expenses and money obligations incurred and payable by the Merchant."  (A 43.)

[4] The record does not reflect the relationship of the various World Imports entities to one another, nor whether representatives from all of those entities signed credit applications similar to the Application executed by World Imports, Ltd.  Indeed, World Imports has argued that, because one page of the Application was signed by a bookkeeper, none of the World Imports entities is bound by that document.  However, in the briefing and argument before us, World Imports has never taken issue with OEC's assertion that all

### B. Procedural Background

On July 3, 2013 (the "Petition Date"), World Imports filed voluntary petitions for relief in the Bankruptcy Court pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). OEC promptly filed a motion for relief from the automatic stay imposed by Bankruptcy Code § 362(a). It argued that it was a secured creditor with a possessory maritime lien on World Imports' goods in its possession and was entitled to refuse to release such goods unless and until certain prepetition claims were satisfied. As exhibits to its motion, OEC provided documentation that, as of July 10, 2013, the total amount owed to OEC by World Imports was $1,452,956. Of that amount, $458,251 was the estimated freight and related charges due on containers then in OEC's possession (the "Landed Goods"). The remaining $994,705 consisted of freight and related charges associated with goods for which OEC had previously provided transportation services (the "Prepetition Goods"). OEC estimated the total value of World Imports' goods then in OEC's possession was approximately $1,926,363.

World Imports responded by filing an adversary proceeding against OEC and a motion for an expedited

---

the World Imports entities are effectively bound by the contractual provisions of the Invoice and Tariff, both of which grant, like the Application, a continuing lien as security for past debts. For purposes of our analysis, therefore, we take it as given that all of the World Imports entities are bound, at the very least, by the Invoice and the Tariff, and that the primary issue is the legal effect of the agreements reflected in those documents.

hearing to compel OEC to turn over all of World Imports' "Current Goods," which World Imports defined to include both the Landed Goods and goods then in transit for which OEC was to provide delivery in the near future. (A 60.) World Imports represented its willingness to pay OEC for the freight charges on those Current Goods but not for the outstanding charges associated with the Prepetition Goods. After a hearing, the Bankruptcy Court granted the injunctive relief sought by World Imports, ordering that:

> Pursuant to 11 U.S.C. §[]542, [World Imports is] entitled to immediate delivery and possession of the Current Goods and Defendant OEC shall immediately account for and deliver the Current Goods to [World Imports];
>
> …
>
> Upon Defendant OEC's delivery of the Current Goods to [World Imports], [World Imports] shall pay Defendant OEC: (a) the regular freight charges on the Current Goods; (b) documented demurrage/retention charges.

(A 105.) After OEC timely filed its notice of appeal from the Bankruptcy Court's order, that court issued an opinion in support of its order. *See In re World Imports, Ltd. Inc.*, 498 B.R. 58 (Bankr. E.D. Pa. 2013).

OEC did not seek a stay of the Bankruptcy Court's order. Rather, on appeal to the District Court, it requested entry of an order requiring World Imports to pay all outstanding amounts due for OEC's transportation services or, in the alternative, providing OEC with "valid, fully

9

enforceable replacement liens on assets of [World Imports] in the amount of $1,926,363." (A 243.) The District Court ordered the parties to brief "whether the specific contract at issue between the parties created a maritime lien … ." (A 299.) After that briefing, the Court entered an order on January 22, 2015, affirming the order of the Bankruptcy Court. Specifically, the District Court held that OEC did not possess a valid maritime lien on the Prepetition Goods because "the provisions in OEC's contract with [World Imports] purporting to give OEC a lien on goods in its possession for freight charges for the Prepetition Goods [are] unenforceable." *World Imports, Ltd. v. OEC Group New York*, 526 B.R. 127, 135 (E.D. Pa. 2015). Accordingly, OEC could not assert a maritime lien to supersede interests secured according to the Uniform Commercial Code as adopted in various jurisdictions. *Id.* at 136. OEC timely appealed.

## II. DISCUSSION[5]

OEC frames its appeal as a single question, namely, whether the Bankruptcy Court and District Court erred in holding that the contract provisions at issue, which purported to give OEC maritime liens on goods in its possession both for freight charges on those goods and for unpaid charges on prior shipments, were unenforceable. In its response, World Imports has added the further question of whether OEC's failure to obtain a stay of the Bankruptcy Court's order renders the appeal moot. We address the latter question first.

### A. Mootness

World Imports argues that OEC's appeal should be dismissed as constitutionally moot because OEC failed to obtain a stay of the Bankruptcy Court's order and, instead, fully complied with that order by releasing the Current Goods

---

[5] Pursuant to 28 U.S.C. § 1334(b), the Bankruptcy Court had jurisdiction over the adversary proceeding, which was a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (E), and (O). Pursuant to 28 U.S.C. §§ 158(a) and 1292(a), the District Court had jurisdiction over the appeal from the Bankruptcy Court's order granting injunctive relief. We have appellate jurisdiction to review the decision of the District Court pursuant to 28 U.S.C. § 1291. In our review, we "exercise the same standard of review as the District Court when it reviewed the original appeal from the Bankruptcy Court. Thus, we review the Bankruptcy Court's findings of fact for clear error and exercise plenary review over the Bankruptcy Court's legal determinations." *In re Handel*, 570 F. 3d 140, 141 (3d Cir. 2009) (citation omitted).

to World Imports in exchange for payment for the charges on those goods.  That argument, however, fails to account for remedies that may still be granted to OEC.  As we observed in *In re Continental Airlines*,

> an appeal is moot in the constitutional sense only if events have taken place during the pendency of the appeal that make it impossible for the court to grant any effectual relief whatsoever.  An appeal is not moot merely because a court cannot restore the parties to the *status quo ante*.  Rather, when a court can fashion some form of meaningful relief, even if it only partially redresses the grievances of the prevailing party, the appeal is not moot.

91 F.3d 553, 558 (3d Cir. 1996) (internal quotation marks omitted); *see also Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992).  In this case, although OEC complied with the Bankruptcy Court's order by delivering the Current Goods, it has asked for relief that would remedy its loss from the surrender of those goods, specifically, a court order either requiring World Imports to pay its outstanding debts to OEC or granting OEC enforceable replacement liens on other assets of World Imports.  Because we are not precluded from granting any effective relief, OEC's appeal is not moot.[6]

---

[6] Although World Imports cites *Continental Airlines* for the authority that failure to seek a stay may, in some circumstances, justify dismissal of an appeal, the language on which it relies was describing not constitutional but equitable

### B. Whether OEC Held a Valid Maritime Lien

The District Court concluded, and World Imports does not dispute, that a valid maritime lien would supersede any UCC security interests that may exist in the World Imports cargo. World Imports also concedes that OEC possessed a valid maritime lien on the Current Goods "for the actual freight charges associated with the Current Goods."[7] (Appellees' Br. 10 n.5.) Thus, the only dispute is whether OEC held a valid maritime lien for charges associated with the Prepetition Goods.

#### 1. Maritime Liens Generally

"A maritime lien is a privileged claim upon maritime property, such as a vessel, arising out of services rendered to

---

mootness, *see Continental*, 91 F.3d at 558, which is not at issue here.

[7] OEC cites numerous authorities to establish that, as a non-vessel-operating common carrier contracting primarily to transport goods by sea, its contracts with World Imports were maritime contracts. Moreover, OEC argues that, although it does not physically transport goods, it takes legal responsibility for their transportation and thus "is treated by the law as a bona fide carrier entitled to assert a maritime lien on cargo." (Appellant's Br. 13 n.4 (citing *Logistics Mgmt.*, 86 F.3d at 913-15).) Although World Imports disputes that its contracts with OEC, by themselves, created maritime liens, it does not dispute that OEC's role as a non-vessel-operating common carrier created maritime liens arising by operation of law.

or injuries caused by that property." 1 Thomas J. Schoenbaum, *Adm. and Mar. Law* § 9-1, at 683 (5th ed. 2011). Maritime liens are a security device intended "to keep ships moving in commerce while preventing them from escaping their debts by sailing away." *Id.* at 684-85. Thus, such a lien attaches to the maritime property from the moment a debt arises, and adheres, even through changes in the property's ownership, until extinguished by operation of law. *Id.* at 683.

Because maritime liens enjoy a special priority status and may operate without notice, courts are hesitant to recognize new forms of them or new circumstances under which such liens may arise. *See Osaka Shosen Kaisha v. Pacific Export Lumber Co.,* 260 U.S. 490, 499 (1923) ("The maritime privilege or lien, though adhering to the vessel, is a secret one which may operate to the prejudice of general creditors and purchasers without notice and is therefore stricti juris and cannot be extended by construction, analogy or inference." (citing *Vandewater v. Mills, Claimant of Yankee Blade*, 60 U.S. 82 (1856))). Federal courts nevertheless "have full authority to update old doctrines and to recognize new forms of liens if warranted by new conditions." *Logistics Mgmt., Inc. v. One (1) Pyramid Tent Arena*, 86 F.3d 908, 913 n.7 (9th Cir. 1996) (internal quotation omitted) (collecting cases).

In much the same way that traditional maritime liens against a ship were based on the legal fiction that the ship was the wrongdoer, *see* 1 Schoenbaum, *supra*, § 9-1, at 683-84, maritime law recognizes a reciprocal claim against the ship's cargo for debts associated with it.

> Subject to the exception that the lien of the shipowner may be displaced by an unconditional delivery of the goods before the consignee is required to pay the freight, or by an inconsistent and irreconcilable provision in the charter-party or bill of lading, the rule is universal as understood in the decisions of the Federal courts, that the ship is bound to the merchandise and the merchandise to the ship for the performance on the part of the shipper and shipowner of their respective contracts.

*The Maggie Hammond*, 76 U.S. (9 Wall.) 435, 449-50 (1869). As the Supreme Court acknowledged in its influential opinion in a case captioned simply *The Bird of Paradise*, such liens on cargo may arise out of contracts to pay freight. 72 U.S. (5 Wall.) 545 (1866); *see also* 2 Thomas A. Russell, *Benedict on Admiralty* § 44, at 3-50 n.2 (7th ed. rev. 2010) (collecting cases).

### 2. Waiver of Liens for Unpaid Freight

A lien for unpaid freight "arises from the right of the ship-owner to retain the possession of the goods until the freight is paid," and thus is lost upon "*unconditional* delivery to the consignee." *Bird of Paradise*, 72 U.S. at 555 (emphasis added). Yet, because it would frustrate commerce to require shipowners to retain their liens only by actual possession of the implicated cargo,[8] a shipowner enjoys a strong

---

[8] *See In re 4,885 Bags of Linseed*, 66 U.S. (1 Black) 108, 114 (1861) (emphasis added):

> It is in the interest of the ship-owner that his

15

presumption that, absent a clear indication to the contrary, he has not waived his cargo lien upon delivery of that cargo.[9]  To

_____

> vessel should discharge her cargo as speedily as possible after her arrival at the port of delivery. And it would be a serious sacrifice of his interests if the ship was compelled, in order to preserve the lien, to remain day after day with her cargo on board, waiting until the consignee found it convenient to pay the freight, or until the lien could be enforced in a court of admiralty.  The consignee, too, in many instances, might desire to see the cargo unladen before he paid the freight, in order to ascertain whether all of the goods mentioned in the bill of lading were on board, and not damaged by the fault of the ship. … *And if the cargo cannot be unladen and placed in the warehouse of the consignee, without waiving the lien, it would seriously embarrass the ordinary operations and convenience of commerce, both as to the ship-owner and the merchant.*

[9] *See Bird of Paradise*, 72 U.S. at 556 (emphasis added):

> Where the stipulation is, that the goods are to be delivered at the port of discharge before the freight is paid, without any condition or qualification, it seems to be agreed that the lien of the ship-owner for the payment of the freight is waived and lost, as the right of lien is inseparably associated with the possession of the goods.  Unless the stipulation is, that the

16

overcome the presumption against waiver, a court determining whether a cargo lien has been waived by unconditional delivery may consider, among other things, whether there was an understanding between the parties regarding retention of the lien either before or at the time the consignee took possession of the cargo,[10] whether there was a

> delivery shall precede the payment of the freight, and the language employed as applied to the subject-matter and the surrounding circumstances is such as clearly to show that the change of possession is to be absolute and unconditional, *the lien is not displaced, as the presumption of law is the other way*, which is never to be regarded as controlled, except in cases where the language employed in the instrument satisfactorily indicates that such is the intention of the parties.

*See also N.H. Shipping Corp. v. Freights of the S/S Jackie Hause*, 181 F. Supp. 165, 169 (S.D.N.Y. 1960) ("This right of the vessel [to a cargo lien] is so strong in the eyes of the admiralty that it will only be considered relinquished by the most unequivocal and express terms or the most absolute and unconditional surrender." (citing *Bird of Paradise*, 72 U.S. 545)); 1 Schoenbaum, *supra*, § 9-7, at 728-29 ("A lienholder may waive his lien either expressly or by implication, but waiver is not favored, and the courts will require a clearly manifested intention to forego the lien." (internal footnote omitted)).

[10] *See The Eddy*, 72 U.S. (5 Wall.) 481, 495-96 (1866) (affirming that courts will uphold the parties' agreement that a cargo lien shall survive delivery).

stipulation in the contract of affreightment inconsistent with the exercise of a lien, or whether other security was taken when the cargo was discharged. 2 Russell, *supra*, § 44, at 3-52.

Both the Bankruptcy Court and the District Court appear to have assumed, without analysis, that OEC did not merely deliver the Prepetition Goods to World Imports, but did so unconditionally and thus in waiver of its liens on those goods.[11] Given the strong presumption against waiver, and in the absence of clear evidence of unconditional delivery, we cannot agree with that assumption. The evidence appears to us to be very much to the contrary. Consistent with the presumption against waiver, both the Application and the Tariff expressly state the understanding of the parties that OEC would hold liens against any World Imports goods in OEC's possession as security for (among other things) charges incurred for any shipment of World Imports goods, and that such liens would "survive delivery." (A 37, 54.) Independent of the question of whether those provisions are fully enforceable in and of themselves, they are compelling evidence that OEC did not clearly intend to waive its cargo liens on the Prepetition Goods by making an unconditional

---

[11] *See In re World Imports, Ltd. Inc.*, 498 B.R. 58, 62 (Bankr. E.D. Pa. 2013) (rejecting OEC's reliance on *Bird of Paradise*, emphasizing that that case "*nowhere* explicitly states that a *maritime* lien may be extended by contract to secure goods already shipped and unconditionally released to an owner" (original emphasis)); *World Imports, Ltd. v. OEC Group N.Y*, 526 B.R. 127, 133 (E.D. Pa. 2015) (referring to the Prepetition Goods as "those already unconditionally delivered").

18

delivery of such goods. They show instead that there was an agreement between the parties, for the purpose of perpetuating any such lien, to apply unwaived and unsatisfied liens toward cargo currently in OEC's possession, the cargo essentially taking the place of cargo previously delivered out of OEC's possession. Moreover, this case is akin to *Capitol Transportation, Inc. v. United States*, in which the First Circuit rejected the argument that a carrier had waived its liens on prior shipments when it released shipping containers "without providing notice of a continuing lien," noting that "the relevant tariffs in effect in this case provide that such liens survive delivery of the goods." 612 F.2d 1312, 1324-25 (1st Cir. 1979). Those tariffs, the court affirmed, "are considered binding and in essence carry the force of law." *Id.* at 1325. In light of the express language of OEC's Tariff, that case squarely supports the position that OEC did not unconditionally deliver the Prepetition Goods, and hence retained its liens on those goods.

We further note that the persistence of a lien through substitution is not a novel practice, as "[i]t is familiar doctrine of the admiralty courts that a maritime lien attaches not only to the original subject of the lien, but also to whatever is substituted for it, and that the lienholder may follow the proceeds wherever he can distinctly trace them." *Bank of British N. Am. v. Freights, etc., of the Hutton*, 137 F. 534, 536 (2d Cir. 1905). *Cf. N.H. Shipping Corp. v. Freights of the S/S Jackie Hause*, 181 F. Supp. 165, 171 (S.D.N.Y. 1960) (holding that a shipowner had not waived its cargo lien when its release of the cargo was conditioned on the substitution of freight money, held in escrow, for such cargo).

World Imports disputes that the parties could have created valid maritime liens entirely through contract, but it has not attempted to dispute that, as a general proposition, OEC's carrier services created enforceable maritime liens by operation of law. Indeed, World Imports' consistent acknowledgment that "OEC possessed a maritime lien on the Current Goods for the actual freight charges associated with the Current Goods" is also, by implication, a tacit concession that OEC, at least initially, must have possessed comparable maritime liens on the Prepetition Goods for freight charges associated with *those* goods. (Appellees' Br. 10.) Hence, if one concludes, as we do, that OEC never waived those liens on the Prepetition Goods, then the question of whether the parties could and did create the liens solely through contract is a red herring. Instead, the dispositive questions are whether liens arising by operation of maritime law may be modified or extended by agreement, and whether such an agreement may extend an unwaived lien onto property currently in the lienholder's possession.

### 3. Enforceability of Maritime Lien Provisions

World Imports argues against the enforceability of the parties' contractual lien modifications by pointing to portions of the Supreme Court's opinion in *Bird of Paradise* which state that maritime liens on cargo are established by operation of law rather than agreement of the parties and arise from the shipowners' possessory interest in the cargo. Attempting to place on OEC the burden of proving both that the parties intended to preserve the maritime liens for the Prepetition Goods and that the delivery of those goods was not

20

unconditional,[12] World Imports argues that OEC has failed to produce "any evidence whatsoever to demonstrate that the delivery of the Prepetition Goods was anything but unconditional." (Appellees' Br. 14 n.9.) Insisting that OEC made such an unconditional delivery of the Prepetition Goods, World Imports essentially argues that *Bird of Paradise* does not authorize the parties to reassert waived liens from the Prepetition Goods onto the Current Goods. Both the District Court and Bankruptcy Court accepted that argument and declined to interpret *Bird of Paradise* as authorizing the parties' contractual extension of OEC's maritime liens.

To recap, our analysis of the facts begins from a very different premise than that adopted by the District Court and Bankruptcy Court. They assumed that OEC waived its liens on the Prepetition Goods through unconditional delivery but nevertheless tried, through contract, to revive those liens and place them on the Current Goods. We conclude that OEC did not waive its previous liens but rather agreed with World Imports in advance that such liens would survive delivery and would be applied to any of World Imports' goods currently in

---

[12] Specifically, World Imports cites *Logistics Mgmt.*, 86 F.3d at 914-15, as supportive of their position that "OEC bears the burden to produce evidence which shows that the parties intended to preserve the maritime lien." (Appellees' Br. 14 n.9.) Although *Logistics Mgmt.* reiterates that a maritime lien is lost on unconditional delivery, we discern nothing in that case placing on the lienholder the burden of proving that the parties intended to preserve the lien. Rather, as noted above, the presumption falls heavily in the opposite direction.

OEC's possession. On that foundation, we hold that their agreement to extend the liens is enforceable.

Despite World Imports' contentions, the opinion in *Bird of Paradise* made clear that there is no internal contradiction in recognizing a lien as a creature of maritime law that, once created by operation of law, may be extended or modified by agreement of the parties. In that case, the Court affirmed that a maritime lien "arises from the usages of commerce, independently of the agreement of the parties … ." *Bird of Paradise*, 72 U.S. at 555; *see also Osaka*, 260 U.S. at 499-500 (clarifying that "[t]he contract of affreightment itself creates no lien, and this court has consistently declared that the obligation between ship and cargo is mutual and reciprocal and does not attach until the cargo is on board or in the master's custody"); *Krauss Bros. Lumber Co. v. Dimon S.S. Corp.*, 290 U.S. 117, 121 (1933) (affirming that, while contracts may form the basis of a maritime lien, it is "[o]nly upon the lading of the vessel or at least when she is ready to receive the cargo" that the lien arises or attaches). In other words, a traditional maritime lien cannot be created by contract alone, but that does not mean that such liens, once created, are beyond contractual modification.

On the contrary, immediately after recognizing that a cargo lien, being possessory, "is lost by an unconditional delivery to the consignee," *Bird of Paradise* used broad language supporting contractual modification and extension of the lien beyond delivery, stating:

> Parties, however, *may frame their contract of affreightment as they please,* and *of course may employ words to affirm the existence of the*

22

*maritime lien, or to extend or modify it,* or they may so frame their contract as to exclude it altogether. They may agree that the goods, when the ship arrives at the port of destination, shall be deposited in the warehouse of the consignee or owner, and that the transfer and deposit shall not be regarded as the waiver of the lien; and *where they so agree, the settled rule in this court is, that the law will uphold the agreement and support the lien*.

72 U.S. at 555 (emphasis added)

The Bankruptcy Court interpreted that passage more narrowly than the language calls for, hanging great weight on the opinion's prior use of the definite article "the" before the word "freight" to conclude that a maritime lien was limited to the immediate circumstances in which it arose:

> [In *Bird of Paradise*], the High Court stated that the "[l]egal effect of such a lien is that the ship-owner, as carrier by water, may retain the goods until *the* freight is paid … " *Id*. at 555. It added that the lien "arises from the right of the ship-owner to retain the possession of the goods until *the* freight is paid, and is lost by an unconditional delivery to the consignee." *Id*. This Court places emphasis on the definite article ("the") preceding the word "freight." It reads those statements to limit the extent of a maritime lien to the freight charges for *those goods* on *that vessel* at *that time*. It does not share OEC's reading of the case to allow the

23

parties to unconditionally extend the lien to unpaid freight for *prior cargo deliveries.  See also Newell* [*v. Norton*, 70 U.S. (3 Wall.) 257, 262 (1865)] ("Indeed, the only power the contracting parties have respecting such liens as attach as consequences to certain contracts is, that the creditor may waive the lien, and may by express stipulation, or by his manner of dealing in certain cases, give credit exclusively to those who would also have been bound to him personally by the same contract which would have given rise to the lien.").

*In re World Imports*, 498 B.R. at 61-62 (original emphasis). Besides its underlying assumption that OEC waived its prior liens through unconditional delivery, we think the Bankruptcy Court's analysis is flawed by two significant oversights. First, it overlooks the context and sequence in which the supposedly limiting language appeared in the *Bird of Paradise* opinion.  As mentioned above, the Supreme Court's opinion began by describing the origins and traditional form of maritime liens, but then, in its transition between paragraphs, signaled that the parties may depart from the norm by contractual agreement.  *See Bird of Paradise*, 72 U.S. at 555 ("[T]he lien … arises from the right of the ship-owner to retain the possession of the goods until the freight is paid, and is lost by an unconditional delivery to the consignee.  *Parties, however, may frame their contract of affreightment as they please*, and of course may employ words to affirm the existence of the maritime lien, *or to extend or modify it … .*" (emphasis added and footnote omitted)).  Had the order of the statements been reversed – that is, had the Supreme Court stressed the traditional form of

24

maritime liens *after* discussing contractual modification – that might provide a stronger basis from which to argue that the Supreme Court intended to limit (albeit only implicitly) the scope of contractual modifications of liens to something closely resembling the traditional form. However, read in proper sequence, the Supreme Court's opinion signals the opposite message, namely, that despite the non-contractual origins and traditional form of maritime liens, parties are free to contractually extend or modify an existing lien "as they please." *Id.*, 72 U.S. at 555.

The Bankruptcy Court's second oversight is its casual citation to language appearing in the report of another Supreme Court case, *Newell v. Norton*, language that is not the Supreme Court's but is merely a summary of one party's position in the syllabus of that case, on a point which ultimately played no role in the Court's analysis. *See Newell*, 70 U.S. at 261-62 (documenting the arguments of counsel for the appellants in that case). World Imports has pushed that erroneous reliance on *Newell*'s syllabus at every stage of the proceedings (*see* A 65, 258, 318; Appellees' Br. 13), even after OEC has repeatedly, and correctly, drawn attention to the citation's complete absence of authoritative value (*see* A 223, 227, 231, 274, 280, 307; Appellant's Br. 22, 25 n.8; Reply Br. 8-9). The dogged determination of World Imports to perpetuate a clear error of citation is both troubling and revealing.

Especially in light of the "familiar doctrine" that a maritime lien may attach to property substituted for the original object of the lien, *Bank of British N. Am.*, 137 F. at 536, we see no sound reason why the parties' contractual transfer of the unwaived liens to the Current Goods should

not have been enforceable.[13] *See also Logistics Mgmt.*, 86 F.3d at 914 ("Contractual provisions regarding liens on cargo for freight are enforceable in admiralty." (citing *Bird of Paradise*, 72 U.S. at 555)); *id.* ("[A] lien on the cargo is normally expressly granted in the bills of lading and charter parties. If so, the extent of the relevant lien is governed by the terms of the lien clause." (quoting Eric M. Danoff, *Provisional Remedies in Adm. U.S.*, 4 U.S.F. Mar. L.J. 293, 299 (1992)))).

---

[13] Despite the seemingly broad scope of contractual modification contemplated by *Bird of Paradise*, there must of course be some limiting principal that would prevent contracting parties from unilaterally altering the rights of bona fide purchasers whose interests would otherwise be affected by a continuing lien on cargo that has passed into the stream of commerce. The facts of this case, however, do not implicate that concern, as OEC has only sought to enforce its liens on goods that were still in its possession, and has conceded that the case may be resolved on those more limited grounds. Hence, while we understand the Bankruptcy Court's resistance to "the proposition that the freight charges for goods upon their release from a warehouse and entry into the hands of others in the ordinary course of commerce remain secured by a pre-existing *maritime* lien," *In re World Imports*, 498 B.R. at 62 (original emphasis), we emphasize that the disposition of this case concerns only the enforceability of a contractual transfer of a lien from previously released goods to currently held goods. In short, the enforceability of a provision asserting a maritime lien on goods that have already been released into the stream of commerce is not at issue in this case.

Both the District Court and World Imports raise the policy argument that an extended maritime lien on cargo could hurt innocent third parties. In doing so, they rely primarily on *Atlantic Richfield Co. v. Good Hope Refineries, Inc.*, 604 F.2d 865 (5th Cir. 1979), in which the Fifth Circuit concluded that a transportation provider could not assert a lien on undelivered cargo to secure unpaid charges on already delivered cargo. After concluding, as a matter of contractual interpretation, that the applicable lien clause did not guarantee this right "[o]n its face" and was not otherwise ambiguous, *id*. at 871, the court opined, in dicta, that a broader construction of the contractual language might also have unfavorable consequences to third parties:

> [An] expansive interpretation of this maritime lien clause … would have consequences far beyond the situation where the cargo belonged to the charterer and was seized before it left the vessel. The lien for the debts of past voyages would extend to cargo owned by others, and might, if all the other terms of the entire clause were literally enforced, follow that cargo after delivery, even if all freights due for its carriage were paid. We *decline to sanction reinterpretation of words apparently clear* to permit this result.

*Id*. at 873 (emphasis added).

The Fifth Circuit's policy concerns were apparently ancillary to what the court considered a question of contractual interpretation, but the District Court in the present case decided that the lien clauses now at issue are

27

unenforceable on policy grounds alone. Specifically, it worried that "[a] third-party purchaser of the undelivered goods would have no notice that the goods it purchased could be withheld pursuant to a maritime lien on previously-shipped goods." *World Imports*, 526 B.R. at 134.

Putting aside the real and immediate harm of depriving OEC of the benefit of its bargain with World Imports, at least three other considerations weigh against the District Court's policy concern. First, any risk to third parties is mitigated by the fact that, unlike the voyage charter at issue in *Atlantic Richfield*, OEC's Tariff not only specifies the applicability of the maritime lien to unsatisfied debts of previous shipments in unambiguous language, but does so in a published document.

Second, the potential of harm to third parties is implicated regardless of whether the maritime lien is intended to satisfy the consignee's immediate charges or past ones. In either case, the lien creates the danger that the consignee's failure to meet its obligations to the carrier will impede its ability to put the cargo into the hands of a third party. "[T]his is a characteristic of all maritime liens." *Usher v. M/V Ocean Wave*, 27 F.3d 370, 374 (9th Cir. 1994). Any marginal increase in the risk to third parties (above the risk inherent in a traditional lien on cargo) is limited in this case because, as already noted *supra* n.13, the goods to which the previous liens attached were still in the carrier's possession. In other words, the type of lien asserted in this case was still, at bottom, a possessory lien over goods that had not yet entered the stream of commerce.

Third, we must consider the potential benefits to commerce of enforcing the parties' voluntary decision to

28

enter into this type of credit arrangement. Although World Imports has argued that commerce is hindered by allowing a current shipment of goods "to be held hostage" to secure the payment of prior shipments, that argument ignores the commercial benefit implicit in that or any other credit arrangement that facilitates the exchange of goods or services with a guarantee of future payment. The relevant fact is not simply that the most recent shipment was held up, but that numerous prior shipments were *not* held up because the shipper had assurances that it could release those shipments conditionally, without surrendering its liens. In other words, while the traditional cargo lien promotes commerce by ensuring that a particular ship can assert a secured claim even after the cargo has conditionally left the ship, OEC's contractually modified lien further promotes commerce over a series of transactions by ensuring that the carrier can retain its secured claims in an ongoing business relationship.[14]

---

[14] OEC also points to *Eagle Marine Transp. Co. v. A Cargo of Hardwood Chips*, 1998 WL 382141 (E.D. La. July 8, 1998), as persuasive authority that a lien purporting to enforce freight charges on past shipments is enforceable. In that case, the district court noted that the contract giving rise to the lien provided as follows: "Seller has a maritime lien on all cargo which it may assert and enforce to ensure payment of the freight and demurrage on all current en route shipments and earlier completed shipments. Waiver of such lien on prior shipments does not constitute a waiver as to the cargo covered by this agreement." *Id*. at *1. OEC essentially argues that that case tacitly approved the type of contractual extension of a cargo lien as is implicated here, because "if the court had believed that such a lien provision was not enforceable, it would have so indicated … ." (Appellant's Br.

Besides its public policy argument, the District Court also relied on the oft-cited principle that maritime liens should be strictly construed, reasoning that

> [n]o Supreme Court decision has addressed whether parties may contractually modify a maritime lien to make the delivery of existing shipments contingent on the consignee's payment for already-delivered shipments. As maritime liens are to be strictly construed, this Court declines OEC's invitation to extend or modify maritime liens beyond the circumstances indicated by Supreme Court precedent. *See Osaka Shosen Kaisha*, 260 U.S. at 499 … .

*World Imports*, 526 B.R. at 132-33.

The case which the District Court cited, *Osaka Shosen Kaisha v. Pacific Export Lumber Co*., reaffirmed that "[t]he maritime privilege or lien … is a secret one which may

---

37.)  However, as the District Court pointed out, the issue in that case was whether the transporter had discharged the lien by unconditional delivery, and the court's opinion did not specify "whether the lien at issue was asserted to enforce payment of freight charges to previous shipments" as opposed to the current shipment. *World Imports*, 526 B.R. at 135. Thus, the opinion did not squarely address the enforceability of a lien for charges incurred on past shipments. Nevertheless, the circumstances of that case give at least some indication that the type of contractual modification at issue in this case is not novel.

30

operate to the prejudice of general creditors and purchasers without notice and is therefore strict juris and cannot be extended by construction, analogy or inference." 260 U.S. at 499. And while that principle is sound, we think the District Court has misapprehended its import. The principle does not restrain the private modification of liens arising out of the traditional relationship between ship and cargo – *e.g.*, the lien of the cargo owner on the ship or the lien of the shipowner on the cargo – but rather limits the judicial creation of new circumstances, outside that reciprocal relationship, under which liens may attach in the first instance. The language proscribing the expansion of the lien universe "by construction, analogy or inference" curtails a court's ability to recognize, by mere legal implication, previously unanticipated circumstances under which liens may arise by operation of maritime law, but says nothing about private parties' ability to modify traditional liens by express agreement. Reading that language to limit private lien modifications to those forms previously and specifically blessed by the Supreme Court renders meaningless the same Court's affirmation that parties may extend or modify liens and otherwise frame their contracts of affreightment as they please. *Compare Osaka*, 260 U.S. at 499-500 (finding inadequate legal authority to recognize a new type of lien upon a ship for damages resulting from a failure to accept all the intended cargo),[15] *with Bird of Paradise*, 72 U.S. at 555

---

[15] The *Osaka* court stressed that, under well-established law, the reciprocal obligations between ship and cargo, from which maritime liens arise, do not attach until the cargo is physically loaded on the ship; hence, the court declined to recognize, by inference alone, a lien on the ship for cargo that was contractually anticipated but never actually

31

(recognizing that parties "of course" may agree "to extend or modify" a lien "aris[ing] from the usages of commerce"). The District Court appears to have blurred the distinction between judicial enforcement of a private contract and more comprehensive judicial rule-making, interpreting OEC's enforceability argument as an invitation for the court itself to "extend or modify maritime liens" beyond their traditional forms. *World Imports, Ltd.*, 526 B.R. at 132. In this case at least, there is a material difference between judicial expansion of a legal doctrine and judicial enforcement of a private agreement to vary from a legal default.

---

loaded aboard. *See Osaka Shosen Kaisha v. Pacific Export Lumber Co.,* 260 U.S. 490, 497-500 (1923); *see also Vandewater v. Mills, Claimant of Yankee Blade*, 60 U.S. 82; 89-90 (1856) (invoking the principle of *stricti juris* in concluding that, where the ship does not receive the cargo, no maritime lien or privilege attaches). That is a very different situation from the one presented here, where the question is whether the parties can contractually preserve an existing lien (that is, for cargo that was actually loaded and conditionally delivered) and then apply that surviving lien to subsequent cargo that was also loaded and still in the carrier's possession. Upholding a lien in *Osaka* would have required recognition of a new type of maritime lien incompatible with the theoretical underpinnings of the reciprocal lien relationship – *i.e.*, it would have created a new class of lien for cargo that never touched the ship. By contrast, the present case does not require the recognition of any liens other than those arising through the traditional ship-and-cargo relationship, all based on cargo actually loaded and shipped.

One last argument against enforceability of OEC's liens is embodied in the Bankruptcy Court's conclusion that the contractual arrangement presented here cannot stand because, if permitted, it would effectively negate the utility of general lien laws adopted by the states. According to the Bankruptcy Court: "[I]f OEC's position were correct, parties would *never* need recourse to the *general* lien laws of the several states. An agreement to extend the shipper's maritime lien to any unpaid debt would co-opt the field and suffice to render any further security arrangements wholly unnecessary." *In re World Imports, Ltd. Inc.*, 498 B.R. at 62 (original emphasis). Besides being overstated, that conclusion rests on a faulty premise. Implicit in the stated concern is, once again, an assumption that all previous liens on goods from prior shipments were unconditionally waived. In that view, OEC is attempting a *post hoc* resurrection of liens that it had already surrendered by unconditional delivery – a contractual cheat that would allow it to essentially jump back to the front of the creditor line after relinquishing its spot.

Given the express agreement that OEC would not waive its liens upon delivery, however, the parties' contractual modification is better regarded as an *ex ante* agreement that OEC would simply retain the position already afforded to it by operation of maritime law. Put differently, the contractual extension of OEC's outstanding liens from the Prepetition Goods onto the Current Goods allowed OEC, at most, to do in the aggregate what maritime law already permitted it to do piecemeal with individual shipments, and World Imports' other creditors are only disadvantaged to the same extent they would have been had OEC engaged in the more protracted, commerce-restrictive process of withholding

33

each shipment until its attendant lien was satisfied. If parties to a maritime contract, through negotiation and private ordering, opt to streamline that process by retaining and consolidating liens arising by operation of longstanding maritime law, at least as such liens apply to goods still in the shipper's possession, there is no compelling argument to undo such an agreement.[16]

In sum, we do not think the policy concerns roused by World Imports and accepted by the Bankruptcy Court and District Court are sufficient to either outweigh the benefits to commerce of allowing two sophisticated businesses to contract for a mutually agreeable transportation and credit arrangement, or to curtail the broad contractual freedom that *Bird of Paradise* on its face allows.

---

[16] We are sympathetic to the Bankruptcy Court's concern that permitting the extension of maritime liens necessarily preempts the operation of state-based commercial law, and thus disadvantages – or at least *maintains* at a disadvantage – all creditors whose claims arise under such law. The question of whether centuries of federal admiralty law favoring the claims of the carrier above other creditors should give way to more modernized statutory schemes may be open to legitimate debate. But the debate is not for us. Congress is free to change policy in this area at any time. Unless and until it does, the federal common law of admiralty still prevails over state-based claims, and the traditions of that law are sufficiently well-established to allow carriers holding advantageous maritime liens to make private agreements to preserve, modify and extend those liens through the substitution of currently held goods.

### III. Conclusion

Given the strong presumption that OEC did not waive its maritime liens on the Prepetition Goods, the clear documentation that the parties intended such liens to survive delivery, the familiar principle that a maritime lien may attach to property substituted for the original object of the lien, and the parties' general freedom to modify or extend existing liens by contract, we conclude that the parties' agreement to apply those unwaived liens toward the Current Goods is enforceable. Thus, we will reverse and remand so that OEC may be granted relief appropriate to its valid maritime liens.